Filed 8/29/16

# IN THE SUPREME COURT OF CALIFORNIA

BRISTOL-MYERS SQUIBB COMPANY, )
)
        Petitioner, )
)       S221038
        v. )
)     Ct.App. 1/2 A140035
THE SUPERIOR COURT )
OF SAN FRANCISCO COUNTY, )
)     San Francisco County
        Respondent; )  Super. Ct. JCCP No. 4748
)
BRACY ANDERSON et al., )
)
        Real Parties in Interest. )
_____)

        Bristol-Myers Squibb Company (BMS), a pharmaceutical manufacturer, conducts significant business and research activities in California but is neither incorporated nor headquartered here.  In March 2012, eight separate amended complaints were filed in San Francisco Superior Court by or on behalf of 678 individuals, consisting of 86 California residents and 592 nonresidents, all of whom allegedly were prescribed and ingested Plavix, a drug created and marketed by BMS, and as a result suffered adverse consequences.  BMS contests the propriety of a California court's exercising personal jurisdiction over it for purposes of adjudicating the nonresident plaintiffs' claims.

        Under the particular circumstances present here, we conclude personal jurisdiction is authorized by Code of Civil Procedure section 410.10, which

**SEE DISSENTING OPINION**

extends jurisdiction to the maximum extent permissible under the United States Constitution. Although BMS's business contacts in California are insufficient to invoke general jurisdiction, which permits the exercise of jurisdiction over a defendant regardless of the subject of the litigation, we conclude the company's California activities are sufficiently related to the nonresident plaintiffs' suits to support the invocation of specific jurisdiction, under which personal jurisdiction is limited to specific litigation related to the defendant's state contacts. (See *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 446 (*Vons*).)

Accordingly, we affirm the judgment of the Court of Appeal, which held that BMS was subject to the personal jurisdiction of the California courts on the basis of specific jurisdiction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

BMS manufactures Plavix, a prescription drug used to inhibit blood clotting. In the eight amended complaints filed in the superior court, 86 California residents and 592 residents of 33 other states sued BMS and McKesson Corporation, a pharmaceutical distributor headquartered in California, for injuries allegedly arising out of their use of Plavix.[1] The state in which the largest number of plaintiffs reside is Texas, with 92 plaintiffs, followed by the 86 California plaintiffs, followed by Ohio, with 71 plaintiffs.

Each amended complaint contains the same 13 causes of action: strict products liability (based on both design defect and manufacturing defect); negligence; breach of implied warranty; breach of express warranty; deceit by

---

[1] A ninth case, filed in Santa Clara Superior Court by the County of Santa Clara against defendants was also joined with the other eight cases and assigned to a coordination trial judge of the San Francisco Superior Court. The complaint filed in that matter is not in the record before us nor is it a subject of dispute among the parties as to matters of personal jurisdiction.

concealment (Civ. Code, §§ 1709, 1710); negligent misrepresentation; fraud by concealment; unfair competition (Bus. & Prof. Code, § 17200); false or misleading advertising (Bus. & Prof. Code, § 17500); injunctive relief for false or misleading advertising (Civ. Code, § 1750 et. seq.); wrongful death; and loss of consortium.

The plaintiffs allege that defendants engaged in "negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, and/or sale of Plavix." According to the complaints, defendants allegedly promoted the drug to consumers and physicians by falsely representing it "as providing greater cardiovascular benefits, while being safer and easier on a person's stomach than aspirin," but defendants knew those claims were untrue because ingesting Plavix allegedly involves "the risk of suffering a heart attack, stroke, internal bleeding, blood disorder or death [which] far outweighs any potential benefit."

Plaintiffs allege different injuries, and sometimes combinations of injuries, which they claim were caused from the ingestion of Plavix.  These injuries include bleeding, bleeding ulcers, gastrointestinal bleeding, cerebral bleeding, rectal bleeding, heart attack, stroke, hemorrhagic stroke, subdural hematoma, thrombotic thrombocytopenic purpura, and death.  The complaints allege that 18 of the 678 individuals whose injuries underlay these actions died as the result of ingesting Plavix.

The actions were assigned as a coordinated matter to a judge of the San Francisco Superior Court.

BMS moved to quash service of summons on the ground that the court lacked personal jurisdiction over it to adjudicate the claims of the 592 nonresident plaintiffs, who are real parties in interest in this proceeding (hereafter referred to as "the nonresident plaintiffs").  BMS noted that the complaints' allegations do not

3

include any factual claims that the nonresident plaintiffs' injuries occurred in California or that they had been treated for their injuries in California.

In declarations supporting the motion, BMS officers stated that the company is incorporated in Delaware, is headquartered in New York City, and maintains substantial operations in New Jersey, including major research and development campuses. BMS has approximately 6,475 employees in the New York and New Jersey area, comprising 51 percent of its United States workforce.

BMS further asserted that its research and development of Plavix did not take place in California, nor was any work related to its labeling, packaging, regulatory approval, or its advertising or marketing strategy performed by any of its employees in this state. BMS has never manufactured Plavix in California. These activities were instead performed or directed from the company's New York headquarters and New Jersey operating facilities. According to data provided by the company, in a 12-month period ending in July 2012, BMS's sales revenue from Plavix sales in California constituted 1.1 percent of the company's total nationwide sales revenue of all of its products.

But the declarations submitted by BMS also disclosed that the company maintains substantial operations in California, including five offices that are primarily research and laboratory facilities employing approximately 164 people. BMS additionally employs approximately 250 sales representatives in the state. BMS also has a small office in Sacramento to represent and advocate for the company in state government affairs.

In opposition to the motion to quash, plaintiffs submitted materials showing that BMS sold almost 187 million Plavix pills to distributors and wholesalers in California in 2006-2012, with sales revenue of almost $918 million. Furthermore, plaintiffs noted that BMS maintains a registered agent for service of process in California.

4

The superior court denied BMS's motion to quash service of summons, concluding the company's sales and other activities in California were sufficiently extensive to subject it to the general jurisdiction of the state courts.

BMS petitioned the Court of Appeal for a writ of mandate, naming the nonresident plaintiffs as real parties in interest. The Court of Appeal first summarily denied the petition on the same day as the United States Supreme Court announced its decision in *Daimler AG v. Bauman* (2014) 571 U.S. ___ [134 S.Ct. 746] (*Daimler*), which clarified limits on general jurisdiction. We granted review and transferred the matter back to the Court of Appeal for issuance of an order to show cause in light of *Daimler*. After briefing and oral argument, the Court of Appeal again denied the writ, this time by an opinion holding that BMS's activities in California were insufficient to subject it to general jurisdiction in the state, but that, given the nature of the action and BMS's activities in California, our courts may properly exercise specific jurisdiction over BMS in this matter.

We granted BMS's petition for review, requesting briefing on both types of personal jurisdiction, general and specific.

## II. DISCUSSION

Under Code of Civil Procedure section 410.10, California courts "may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States." "The Due Process Clause of the Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgment of its courts." (*Walden v. Fiore* (2014) 571 U.S. ___, ___ [134 S.Ct. 1115, 1121].) "Due process limits on the State's adjudicative authority principally protect the liberty of the nonresident defendant — not the convenience of plaintiffs or third parties." (*Id.* at p. ___ [134 S.Ct. at p. 1122].)

Under the federal Constitution, a court exercising jurisdiction over a nonresident defendant comports with due process as long as the defendant "has

5

such minimum contacts with the state that the assertion of jurisdiction does not violate ' "traditional notions of fair play and substantial justice." ' " (*Vons, supra*, 14 Cal.4th at p. 444, quoting *International Shoe Co. v. Washington* (1945) 326 U.S. 310, 316 (*International Shoe*).)  Plaintiffs bear the initial burden of proving state contacts sufficient to justify the exercise of jurisdiction.  (*Vons*, *supra*, 14 Cal.4th at p. 449.)  The jurisdiction of courts to render judgment against a person is historically grounded in the courts' power over the person, originally premised on a person's presence within the territorial jurisdiction of the court. (*International Shoe*, *supra*, 326 U.S. at p. 316.)  Because "the corporate personality is a fiction," however, a corporation's " 'presence' " in a state must be determined by the activities of its agents (*ibid.*), and the demands of due process in this context "may be met by such contacts of the corporation with the state of the forum as make it reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there." (*Id.* at p. 317.)

In some cases, the corporation's continuous activities within the state have been found "so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." (*International Shoe*, *supra*, 326 U.S. at p. 318.)  This has become known as "general," or "all-purpose," jurisdiction.  (*Daimler*, *supra*, 571 U.S. ___ [134 S.Ct. 746, 751, 754].)

In other circumstances, where the company's activities in the forum state are more limited, general jurisdiction may be lacking but jurisdiction may nonetheless be proper because the litigation is derived from obligations that "arise out of or are connected with the [company's] activities within the state." (*International Shoe*, *supra*, 326 U.S. at pp. 319, 320.)  This has become known as "specific," or "case-linked," jurisdiction.  (*Daimler*, *supra*, 571 U.S. at p. ___ [134 S.Ct. at pp. 751,

6

754]; *Goodyear Dunlop Tires Operations, S.A. v. Brown* (2011) 564 U.S. ___, ___ [131 S.Ct. 2846, 2851] (*Goodyear*).)

"When a defendant moves to quash service of process on jurisdictional grounds, the plaintiff has the initial burden of demonstrating facts justifying the exercise of jurisdiction. [Citation.] Once facts showing minimum contacts with the forum state are established, however, it becomes the defendant's burden to demonstrate that the exercise of jurisdiction would be unreasonable. [Citation.] When there is conflicting evidence, the trial court's factual determinations are not disturbed on appeal if supported by substantial evidence. [Citation.] When no conflict in the evidence exists, however, the question of jurisdiction is purely one of law and the reviewing court engages in an independent review of the record." (*Vons*, *supra*, 14 Cal.4th at p. 449.)

Although the briefing and record at the trial court did not have the benefit of being informed by the high court's decision in *Daimler*, there appears to be no material factual conflicts nor any dispute over any factual findings in the superior court. We, therefore, consider the possible exercise of each type of jurisdiction as a matter of law and on the undisputed facts.

### A.  General Jurisdiction

1. *Case law concerning general jurisdiction*

The landmark 1945 decision of the United States Supreme Court in *International Shoe*, *supra*, 326 U.S. 310, serves as the starting point of modern jurisprudence concerning general jurisdiction. Although the high court resolved that case under a specific jurisdiction theory, it also described general jurisdiction as embracing "instances in which the continuous corporate operations within a state were thought so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities."

7

(*International Shoe*, *supra*, 326 U.S. at p. 318.) Subsequent to *International Shoe*, the high court has addressed the concept of general jurisdiction in only a handful of cases.

In *Perkins v. Benguet Mining Co.* (1952) 342 U.S. 437 (*Perkins*), the high court concluded that a company that had temporarily ceased mining operations abroad and had relocated its limited corporate activities to Ohio could be sued in Ohio on a cause of action unrelated to its Ohio corporate activities. (*Id.* at pp. 447-448.) In *Perkins*, because of the wartime Japanese occupation of the Philippine Islands, a Philippine corporation had ceased mining operations on all its properties there, but it maintained limited corporate activities through its president and principal shareholder who had relocated to Ohio. A shareholder then sued the company in Ohio for unpaid dividends and for its failure to issue her certificates for her shares of stock. The high court applied the standard set forth in *International Shoe* and concluded that the president's business activities through his home in Ohio reflected "a continuous and systematic supervision of the necessarily limited wartime activities of the company." (*Perkins*, *supra*, 342 U.S. at p. 448.)

The high court in *Perkins* explained that after the company's mining operations ceased due to the occupation, the president of the company returned to his residence in Ohio. He kept a home office there, maintaining the company's files. From that office he "carried on correspondence relating to the business of the company and to its employees," drew and distributed salary checks on behalf of the company, used and maintained two active Ohio bank accounts carrying substantial balances of the company's funds, retained another Ohio bank to act as transfer agent for the stock of the company, held several directors' meetings in his home or home office, "supervised policies dealing with the rehabilitation of the corporation's properties in the Philippines" from his Ohio home office, and

8

dispatched funds from Ohio to cover purchases of machinery for such rehabilitation. (*Perkins*, *supra*, 342 U.S. at p. 448.)

The high court observed that although "no mining properties in Ohio were owned or operated by the company, many of its wartime activities were directed from Ohio and were being given the personal attention of its president in that State at the time he was served with summons." (*Perkins*, *supra*, 342 U.S. at p. 448.) Thus, the company's wartime operations had been effectively shifted almost entirely to the president's home office in Ohio, which meant that "under the circumstances above recited, it would not violate federal due process for Ohio either to take or decline jurisdiction of the corporation in this proceeding." (*Ibid.*) In other words, the requirements for the exercise of general jurisdiction were met.

In *Helicopteros Nacionales de Colombia v. Hall* (1984) 466 U.S. 408 (*Helicopteros*), the high court concluded that general jurisdiction was not supported in the forum state when the defendant corporation was based abroad, had no physical presence in the forum state other than limited business purchases and contract negotiations, and the cause of action arose abroad and was unrelated to the company's contacts with the forum state. In *Helicopteros*, the survivors of four United States citizens, who had died in a helicopter crash in Peru, filed wrongful death actions in Texas against the owner and operator of the helicopter, a Colombian corporation. (*Id.* at pp. 409-410.) Prior to the helicopter crash, the Colombian corporation had conducted contract negotiations in Texas with the decedents' Texas employer to provide helicopter services, bought helicopters in Texas, and sent employees there for training, but did not conduct other operations or maintain a place of business in the state. None of the plaintiffs or their decedents resided in Texas. (*Id.* at pp. 410-412.) The high court concluded that neither the negotiation of a single contract and receipt of contractual payment through a Texas bank, nor the purchase of helicopters and associated employee

9

training sessions in Texas, constituted "the kind of continuous and systematic general business contacts" that had justified general jurisdiction in *Perkins*. (*Helicopteros* at p. 416; see *id*. at pp. 416-418.)

More recently, in *Goodyear*, *supra*, 564 U.S. ___ [131 S.Ct. 2846], and *Daimler*, *supra*, 571 U.S. ___ [134 S.Ct. 746], the high court significantly elaborated upon its analysis of general jurisdiction, clarifying that in order to support the exercise of general jurisdiction over a corporation its contacts with the forum state must be so extensive as to render the company essentially " 'at home' " in the state. (*Daimler*, *supra,* 571 U.S. at p. ___ [134 S.Ct. at p. 751; see *Goodyear*, *supra*, 564 U.S. at p. ___ [131 S.Ct. at p. 2851].) The United States Supreme Court's description of general jurisdiction for purposes of the federal due process clause, as set forth in *Goodyear* and *Daimler*, is binding upon us and, as explained below, dictates the conclusion that BMS is not subject to the general jurisdiction of California courts.

In *Goodyear*, the high court concluded that the plaintiffs failed to establish support for the exercise of general jurisdiction where the defendant companies were based abroad, sold only a limited quantity of their products in the forum state, and the cause of action — involving the defendants' products sold abroad — also arose abroad. In that case, two young men from North Carolina were killed in a bus accident outside Paris, France. (*Goodyear*, *supra*, 564 U.S. at p. ___ [131 S.Ct. at p. 2851].) Their parents attributed the accident to an allegedly defective tire manufactured by Goodyear's subsidiary in Turkey and filed suit in a North Carolina state court, naming Goodyear and its subsidiaries in Turkey, France, and Luxembourg as defendants. (*Id.* at pp. ___-___ [131 S.Ct. at pp. 2851-2852].) Although a small percentage of their tires was distributed in North Carolina by other Goodyear affiliates, the foreign subsidiaries challenged the North Carolina court's exercise of general jurisdiction over them, contending that they did no

10

direct business and employed no workers in North Carolina. (*Id.* at pp. ___, ___ [131 S.Ct. at pp. 2850, 2852].)

The high court first noted that North Carolina courts lacked specific jurisdiction to adjudicate the controversy because the accident had occurred abroad and the allegedly defective tire had been manufactured and sold abroad. (*Goodyear*, *supra*, 564 U.S. at p. ___ [131 S.Ct. at p. 2851].) The court then held that the defendant corporations' contacts with North Carolina were also insufficient for general jurisdiction: "Unlike the defendant in *Perkins,* whose sole wartime business activity was conducted in Ohio, petitioners are in no sense at home in North Carolina. Their attenuated connections to the State . . . fall far short of . . . 'the continuous and systematic general business contacts' necessary to empower North Carolina to entertain suit against them on claims unrelated to anything that connects them to the State." (*Goodyear*, *supra*, at p. ___ [131 S.Ct. at p. 2857], quoting *Helicopteros*, *supra*, 466 U.S. at p. 416.) The *Goodyear* court explained its "at home" rule for corporations as analogous to a natural person's domicile in the forum state: "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." (*Goodyear*, *supra*, at p. ___ [131 S.Ct. at pp. 2853-2854].)

Three years after *Goodyear*, in *Daimler*, *supra,* 571 U.S. ___ [134 S.Ct. 746], the court further elaborated on its articulation of the "at home" requirement. In *Daimler,* Argentinian residents brought an action in California against DaimlerChrysler AG (DaimlerChrysler), a German public stock company, alleging that its wholly owned subsidiary, Mercedes-Benz Argentina, had "collaborated with state security forces to kidnap, detain, torture, and kill" the plaintiffs or their relatives in Argentina during that nation's " 'Dirty War.' " (*Daimler*, *supra*, at p. ___ [134 S.Ct. at pp. 750-751].) The plaintiffs' claim of general jurisdiction

11

over DaimlerChrysler in California was based in significant part on the California activities of another DaimlerChrysler subsidiary, Mercedes-Benz USA, LLC (MBUSA). Although incorporated in Delaware and headquartered in New Jersey, MBUSA had substantial facilities in California, using them to import and distribute Mercedes-Benz automobiles in the state. (*Id.* at p. ___ [134 S.Ct. at pp. 751-752].)

Even attributing to DaimlerChrysler the activities of its subsidiary, MBUSA, the high court nevertheless found DaimlerChrysler's contacts with California insufficient to justify the exercise of general jurisdiction over it. (*Daimler*, *supra*, 571 U.S. at p. ___ [134 S.Ct. at p. 760].) The court reiterated its observation in *Goodyear* that a corporation's state of incorporation and its principal place of business are the two "paradigm all-purpose forums." (*Daimler*, *supra,* at p. ___ [134 S.Ct. at p. 760.) Although it did not limit general jurisdiction to those two circumstances, the *Daimler* court explained that general jurisdiction may not be based merely on activities in the forum state that can be characterized as continuous and systematic; rather, the corporation's activities must be " 'so "continuous and systematic" as to render [it] essentially at home in the forum State.' " (*Id.* at p. ___ [134 S.Ct. at p. 761], quoting *Goodyear*, *supra*, 564 U.S. at p. ___ [131 S.Ct. at p. 2851].)

The *Daimler* court acknowledged that in an exceptional case such as *Perkins* "a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State." (*Daimler*, *supra*, 571 U.S. at p. ___, fn. 19 [134 S.Ct. at p. 761, fn. 19].) The court, however, emphasized the truly " 'exceptional facts' " of *Perkins,* where "[g]iven the wartime circumstances, Ohio could be considered 'a surrogate for the place of incorporation or head office.' " (*Daimler*, *supra*, at p. ___, fn. 8 [134 S.Ct. at p. 756, fn. 8].) DaimlerChrysler's

12

activities in California, the court observed, "plainly do not approach that level." (*Id.* at p. ___, fn. 19 [134 S.Ct. at p. 761, fn. 19.)

Furthermore, in responding to a concurring opinion by Justice Sotomayor, the *Daimler* majority made clear that the general jurisdiction inquiry "does not 'focu[s] solely on the magnitude of the defendant's in-state contacts.' " (*Daimler*, *supra*, 571 U.S. at p. ___, fn. 20 [134 S.Ct. at p. 762, fn. 20].) Instead, general jurisdiction "calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide." (*Ibid*.) Otherwise, a corporation with significant operations in many states would be deemed at home in all of them. (*Ibid.*) The majority reasoned that to allow the adjudication in California of a dispute arising solely in Argentina merely based on MBUSA's sales activities in the state would give the same global adjudicatory reach to every state in which DaimlerChrysler or its subsidiary had sizeable sales. The court rejected such an "exorbitant exercise[] of all-purpose jurisdiction" because it would defeat the ability of out-of-state defendants to structure their conduct so as to have some predictability regarding the possibility of being subjected to litigation in a given forum state. (*Id.* at p. ___ [134 S.Ct. at pp. 761-762].)

The high court also made clear that because the plaintiffs in *Daimler* had never attempted to argue that California could assert specific jurisdiction over DaimlerChrysler, the court had no reason to undertake such an analysis. (*Daimler*, *supra*, 571 U.S. at p. ___ [134 S.Ct. at p. 758].)

2. *Plaintiffs have failed to show that BMS is subject to general jurisdiction in California*

The United States Supreme Court's at home rule for general jurisdiction over a corporation, as articulated in *Goodyear* and *Daimler*, and, to some extent *Perkins*, defeats the nonresident plaintiffs' claim that California may assert general jurisdiction over BMS. BMS may be regarded as being at home in Delaware,

13

where it is incorporated, or perhaps in New York and New Jersey, where it maintains its principal business centers. Although the company's ongoing activities in California are substantial, they fall far short of establishing that is it at home in this state for purposes of general jurisdiction.

Similar to the California subsidiary in *Daimler*, BMS has sold large volumes of its products in California. Nevertheless, the high court plainly rejected the theory that a corporation is at home wherever its sales are "sizeable." (*Daimler*, *supra*, 571 U.S. at p.___ [134 S.Ct. at p. 761].) BMS employed approximately 164 people in California in addition to its 250 sales representatives in this state. But the company's total California operations are much less extensive than its activities elsewhere in the United States. As noted earlier, in New York and New Jersey alone, BMS employed approximately 6,475 people, 51 percent of its United States workforce. In assessing BMS's California business activities in comparison to the company's business operations "in their entirety, nationwide," we find nothing to warrant a conclusion that BMS is at home in California. (*Daimler*, *supra*, at p. ___, fn. 20 [134 S.Ct. at p. 762, fn. 20].) As the high court warned in *Daimler*, to conclude that BMS may be sued in California on any cause of action, whether or not related to its activities here, under a theory of general jurisdiction, would be to extend globally the adjudicatory reach of every state in which the company has significant business operations.

The nonresident plaintiffs stress that in neither *Goodyear* nor *Daimler* did the high court strictly limit general jurisdiction to a company's state of incorporation or its principal place of business. Nevertheless, both decisions make clear that the suitability of general jurisdiction is rooted in the concept of an individual's domicile and its equivalent place for a corporation. (*Daimler*, *supra*, 571 U.S. at p. ___ [134 S.Ct. at p. 760]; *Goodyear*, *supra*, 564 U.S. 437 [131 S.Ct. at pp. 2853-2854].) Therefore, setting aside the state of a company's incorporation

14

or its headquarters, a plaintiff has the burden of showing that a company's conduct in a given forum state may be so substantial and of such a kind as to render it at home there.

*Goodyear* and *Daimler* approved the finding of general jurisdiction in *Perkins*, *supra*, 342 U.S. 437. That case involved the exceptional fact pattern of a mining company's wartime relocation of its overseas operations to Ohio, which functioned as the equivalent of the corporation's headquarters through a home office in the company president's own residence. Quite literally, the mining company in *Perkins* was also at home in this unique context. But nothing in the record of the present matter suggests that California has served as the equivalent of BMS's headquarters, even temporarily.

The nonresident plaintiffs also rely on the fact that BMS has long been registered to do business in California and has maintained an agent for service of process here. California law, however, requires a foreign corporation transacting business here to name an agent in the state for service of process. (Corp. Code, § 2105, subd. (a)(5).) As the high court has explained, "[t]he purpose of state statutes requiring the appointment by foreign corporations of agents upon whom process may be served is primarily to subject them to the jurisdiction of local courts in controversies *growing out of transactions within the State*." (*Morris & Co. v. Ins. Co.* (1929) 279 U.S. 405, 408-409, italics added.) Accordingly, a corporation's appointment of an agent for service of process, when required by state law, cannot compel its surrender to general jurisdiction for disputes unrelated to its California transactions. The "designation of an agent for service of process and qualification to do business in California alone are insufficient to permit general jurisdiction." (*Thomson v. Anderson* (2003) 113 Cal.App.4th 258, 268, citing *DVI, Inc. v. Superior Court* (2002) 104 Cal.App.4th 1080, 1095; *Gray Line Tours v. Reynolds Electrical & Engineering Co.* (1987) 193 Cal.App.3d 190, 194.)

15

Finally, the nonresident plaintiffs argue BMS is subject to general jurisdiction in California because it has contracted for distribution of Plavix with McKesson Corporation, which is headquartered in San Francisco, allowing BMS "to make a substantial profit within California through McKesson's California contacts." As explained above, however, BMS's sizeable sales of its products in California are insufficient, under *Goodyear, supra*, 564 U.S. ___ [131 S.Ct. 2846] and *Daimler*, *supra*, 571 U.S. ___ [134 S.Ct. 746], to make it at home in this state and subject it to the general jurisdiction of our courts. That some of these sales were made to or through a distributor headquartered here does not change the analysis.

As a result, we conclude that BMS is not subject to the general jurisdiction of the California courts.

## B. Specific Jurisdiction

1. *Case law concerning specific jurisdiction*

Although the high court's recent cases have narrowed the scope of general jurisdiction, in *Daimler* the majority specifically commented on the continued viability and breadth of the court's preexisting specific jurisdiction jurisprudence. In responding to the concern expressed by Justice Sotomayor in her separate opinion in *Daimler* that the court was committing an injustice by limiting the availability of general jurisdiction, the majority remarked that "Justice Sotomayor treats specific jurisdiction as though it were barely there" and that "[g]iven the many decades in which specific jurisdiction has flourished, it would be hard to conjure up an example of the 'deep injustice' Justice Sotomayor predicts as a consequence of our holding that California is not an all-purpose forum for suits against [DaimlerChrysler]." (*Daimler*, *supra*, 571 U.S. at p. ___, fn. 10 [134 S.Ct. at p. 758, fn. 10].)

The basic precepts governing specific jurisdiction set forth in pre-*Daimler* decisions are well settled.  In ascertaining the existence of specific jurisdiction, courts must analyze the " 'relationship among the defendant, the forum, and the litigation.' " (*Helicopteros*, *supra*, 466 U.S. at p. 414, quoting *Shaffer v. Heitner* (1977) 433 U.S. 186, 204.)  The question of whether a court may exercise specific jurisdiction over a nonresident defendant involves examining (1) whether the defendant has " 'purposefully directed' " its activities at the forum state (*Keeton v. Hustler Magazine, Inc.* (1984) 465 U.S. 770, 774 (*Keeton*)); (2) whether the plaintiff's claims arise out of or are related to these forum-directed activities (*Helicopteros*, *supra*, 466 U.S. at p. 414); and (3) whether the exercise of jurisdiction is reasonable and does not offend " ' "traditional notions of fair play and substantial justice." ' "[2] (*Asahi Metal Industry Co. v. Superior Court* (1987) 480 U.S. 102, 113 (*Asahi*), quoting *International Shoe*, *supra*, 326 U.S. at p. 316.)

In our own jurisprudence, we have said that a plaintiff has the initial burden of demonstrating facts to support the first two factors, which establish the requisite minimum contacts with the forum state.  The burden then shifts to the defendant to show that the exercise of jurisdiction would be unreasonable under the third factor. (*Snowney v. Harrah's Entertainment, Inc.* (2005) 35 Cal.4th 1054, 1062 (*Snowney*); see also *Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 477 (*Burger King*) ["where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that

---

**2**      BMS states it is not contesting the first or third factors and that the company is contesting only whether the claims of the nonresident plaintiffs are related to its activities in California.  But, as we will explain, BMS's arguments are not as narrow as it contends.  Accordingly, we will examine here all three factors relevant to the specific jurisdiction analysis.

the presence of some other considerations would render jurisdiction unreasonable"].)

Our courts have also explained that the relatedness requirement for specific jurisdiction is determined under the " 'substantial connection' test," which "is satisfied if 'there is a substantial nexus or connection between the defendant's forum activities and the plaintiff's claim.' [Citation.]" (*Snowney*, *supra*, 35 Cal.4th at p. 1068.) This test requires courts to evaluate the nature of the defendant's activities in the forum and the relationship of the claim to those activities in order to answer the ultimate question under the due process clause: whether the exercise of jurisdiction in the forum is fair. Under the substantial connection test, " 'the intensity of forum contacts and the connection of the claim to those contacts are inversely related.' " (*Ibid*.) " '[T]he more wide ranging the defendant's forum contacts, the more readily is shown a connection between the forum contacts and the claim.' [Citation.] Thus, '[a] claim need not arise directly from the defendant's forum contacts in order to be sufficiently related to the contact to warrant the exercise of specific jurisdiction.' . . . Indeed, ' " '[o]nly when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that [contact].' " ' [Citation.]" (*Ibid*.) Finally, the defendant's activities in the forum state need not be either the proximate cause or the "but for" cause of the plaintiff's injuries. (*Ibid.*)

2. *Purposeful availment*

As the high court has explained, "[t]he Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations,' " and that "[b]y requiring that individuals have 'fair warning that a particular

18

activity may subject [them] to the jurisdiction of a foreign sovereign, "' the due process clause affords predictability and allows potential defendants to tailor their conduct " 'with some minimum assurance as to where that conduct will and will not render them liable to suit.' " (*Burger King*, *supra*, 471 U.S. at pp. 471-472.)

"Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this 'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum, [citation], and the litigation results from alleged injuries that 'arise out of or relate to' those activities." (*Burger King*, *supra*, 471 U.S. at p. 472, fn. omitted.) These activities cannot be the result of the unilateral actions of another party or a third person, because the " 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." (*Id*. at p. 475.) "When a [nonresident defendant] 'purposefully avails itself of the privilege of conducting activities within the forum State,' [citation], it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State." (*World-Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286, 297 (*World-Wide Volkswagen*).)

In *Snowney*, a California resident filed a class action in this state against a group of Nevada hotels, alleging several causes of action related to their purported failure to provide notice of an energy surcharge imposed on hotel guests. (*Snowney*, *supra*, 35 Cal.4th at pp. 1059-1060.) The hotels conducted no business and had no bank accounts or employees in California, but they advertised heavily in this state using California-based media, including billboards, newspapers, and ads aired on radio and television stations, as well as a Web site for room quotes

19

and reservations. They also received a significant portion of their business from California residents who stayed at their hotels. (*Id.* at p. 1059.)

This court held that the Nevada hotels had purposefully availed themselves of the privilege of doing business in California because their Web site had touted "the proximity of their hotels to California" and provided "driving directions from California to their hotels," thereby "specifically target[ing] residents of California." (*Snowney*, *supra*, 35 Cal.4th at p. 1064.) Furthermore, "[a]side from their Web site specifically targeting California residents, defendants advertised extensively in California through billboards, newspapers, and radio and television stations located in California" and "regularly sent mailings advertising their hotels to selected California residents." (*Id.* at p. 1065.) "In doing so, defendants necessarily availed themselves of the benefits of doing business in California and could reasonably expect to be subject to the jurisdiction of courts in California." (*Ibid.*)

In the present matter, there is no question that BMS has purposely availed itself of the privilege of conducting activities in California, invoking the benefits and protection of its laws, and BMS does not contend otherwise. Not only did BMS market and advertise Plavix in this state, it employs sales representatives in California, contracted with a California-based pharmaceutical distributor, operates research and laboratory facilities in this state, and even has an office in the state capital to lobby the state on the company's behalf. As in *Snowney, supra*, 35 Cal.4th 1054, BMS actively and purposefully sought to promote sales of Plavix to California residents, resulting in California sales of nearly $1 billion over six years. Moreover, unlike the Nevada hotels in *Snowney*, BMS maintains a physical presence in California, employing well over 400 people here.

Accordingly, we conclude that BMS has purposefully availed itself of the benefits of California such that the first element of the test for specific personal

20

jurisdiction is met concerning matters arising from or related to BMS's contacts with the state. On the basis of these extensive contacts relating to the design, marketing, and distribution of Plavix, BMS would be on clear notice that it is subject to suit in California concerning such matters. (*World-Wide Volkswagen, supra*, 444 U.S. at p. 19.)

3. *Arises from or is related to*

As previously described, "for the purpose of establishing jurisdiction the intensity of forum contacts and the connection of the claim to those contacts are inversely related." (*Vons*, *supra*, 14 Cal.4th at p. 452.) "[T]he more wide ranging the defendant's forum contacts, the more readily is shown a connection between the forum contacts and the claim." (*Id*. at p. 455.) Thus, "[a] claim need not arise directly from the defendant's forum contacts in order to be sufficiently related to the contact to warrant the exercise of specific jurisdiction." (*Id*. at p. 452.)

In *Vons*, we assessed, on relatedness grounds, whether California courts could exercise specific jurisdiction over nonresident companies for causes of action involving out-of-state injuries that did not arise directly from their California contacts. (*Vons*, *supra*, 14 Cal.4th 434.) The plaintiffs in *Vons* were restaurant franchisees who brought an action for loss of business after contaminated hamburger meat caused illnesses in California and Washington, resulting in adverse publicity. In California, the franchisees sued two parties: the franchisor and the hamburger supplier, Vons Companies, Inc. (Vons), which processed hamburger patties in California and supplied them to the franchisor. Vons cross-complained against the franchisor and two Washington franchisees, suing them for negligence and indemnification for failing to properly cook the hamburger meat at restaurants in Washington, causing the injuries and deaths to customers there that gave rise to their joint liability with Vons. In *Vons*, the issue

21

was whether the California court had specific jurisdiction over these two Washington-based franchisees, Seabest Foods, Inc., and Washington Restaurant Management, Inc. (WRMI).  (*Id*. at pp. 440-442.)

Seabest's and WRMI's contacts with California included food purchases from California suppliers, sending personnel to franchisor training sessions in California, remitting franchise payments to California, permitting the franchisor's inspection of their restaurants by its California-based inspectors, and the negotiation of their franchise agreements in California, which agreements stated that any disputes would be governed by California law.  Because Vons was not a party to the franchise contracts for either Seabest or WRMI, those franchisees' contacts with California did not directly give rise to the causes of action asserted by Vons. (*Vons*, *supra*, 14 Cal.4th at p. 452.)  Nevertheless, this court found personal jurisdiction was properly exercised over them in California because the forum contacts bore a substantial relation to the cause of action.  We explained that requiring the two Washington franchisees to answer to Vons's claim "is not to allow a third party unilaterally to draw them into a connection with the state; rather, it was Seabest and WRMI who established the connection." (*Id*. at p. 451.)

This court further elaborated:  "A claim need not arise directly from the defendant's forum contacts in order to be sufficiently related to the contact to warrant the exercise of specific jurisdiction.  Rather, as long as the claim bears a substantial connection to the nonresident's forum contacts, the exercise of specific jurisdiction is appropriate.  The due process clause is concerned with protecting nonresident defendants from being brought unfairly into court in the forum, on the basis of random contacts.  That constitutional provision, however, does not provide defendants with a shield against jurisdiction when the defendant purposefully has availed himself or herself of benefits in the forum." (*Vons*, *supra*, 14 Cal.4th at p. 452.)

22

In the present matter, plaintiffs allege that BMS negligently designed and manufactured Plavix, failed to disclose material information in its advertising and promotion of Plavix and fraudulently and falsely advertised and promoted the product, and that BMS is liable to those who relied on such representations and were injured by Plavix. Their complaints also contend that "Plavix was heavily marketed directly to consumers through television, magazine and internet advertising." BMS does not contest that its marketing, promotion, and distribution of Plavix was nationwide and was associated with California-based sales representatives and a California distributor, McKesson Corporation, which plaintiffs allege is jointly liable.

The California plaintiffs' claims concerning the alleged misleading marketing and promotion of Plavix and injuries arising out of its distribution to and ingestion by California plaintiffs certainly arise from BMS's purposeful contacts with this state, and BMS does not deny that it can be sued for such claims in California. As to the nonresident plaintiffs' claims, the Court of Appeal understood plaintiffs' complaints as alleging that BMS sold Plavix to both the California plaintiffs and the nonresident plaintiffs as part of a common nationwide course of distribution. BMS has not taken issue with that characterization, nor has it asserted that either the product itself or the representations it made about the product differed from state to state. Both the resident and nonresident plaintiffs' claims are based on the same allegedly defective product and the assertedly misleading marketing and promotion of that product, which allegedly caused injuries in and outside the state. Thus, the nonresident plaintiffs' claims bear a substantial connection to BMS's contacts in California. BMS's nationwide marketing, promotion, and distribution of Plavix created a substantial nexus between the nonresident plaintiffs' claims and the company's contacts in California concerning Plavix.

23

Plaintiffs also allege that BMS negligently developed and designed Plavix, which serves as the basis of its claims of products liability, negligence, and breaches of express and implied warranties. BMS maintains research and laboratory facilities in California, and it presumably enjoys the protection of our laws related to those activities. Although there is no claim that Plavix itself was designed and developed in these facilities, the fact that the company engages in research and product development in these California facilities is related to plaintiffs' claims that BMS engaged in a course of conduct of negligent research and design that led to their injuries, even if those claims do not arise out of BMS's research conduct in this state. Accordingly, BMS's research and development activity in California provides an additional connection between the nonresident plaintiffs' claims and the company's activities in California.

BMS and our dissenting colleagues attempt to characterize the claims of the California plaintiffs as "parallel" to and failing to "intersect" with the nonresident plaintiffs' claims and argue based on this characterization that BMS's conduct in California is insufficiently related to the nonresident plaintiffs' claims. More specifically, BMS contends that the nonresident plaintiffs' claims would be exactly the same if BMS had no contact whatsoever with California. This characterization ignores the uncontested fact that all the plaintiffs' claims arise out of BMS's nationwide marketing and distribution of Plavix. The claims are based not on "similar" conduct, as our dissenting colleagues contend, but instead on a single, coordinated, nationwide course of conduct directed out of BMS's New York headquarters and New Jersey operations center and implemented by distributors and salespersons across the country. (See *Cornelison v. Chaney* (1976) 16 Cal.3d 143, 151 [reasoning that the interstate nature of a defendant's business, while "not an independent basis of jurisdiction" weighs "in favor of requiring him to defend here"].)

Moreover, the argument that claims based on a nationwide course of conduct fail to establish relatedness for purposes of minimum contacts rests on the invalid assumption that BMS's forum contacts must bear some substantive legal relevance to the nonresident plaintiffs' claims, as the dissent explicitly contends. Yet in *Vons*, this court carefully considered and ultimately rejected such a substantive relevance requirement. (*Vons*, *supra*, 14 Cal.4th at p. 475 ["we conclude that the substantive relevance test is inappropriate"].) Rather, it is sufficient if "because of the defendants' relationship with the forum, it is not unfair to require that they answer in a California court for an alleged injury that is substantially connected to the defendants' forum contacts." (*Id.* at p. 453.) Here, BMS's forum contacts, including its California-based research and development facilities, are substantially connected to the nonresident plaintiffs' claims because those contacts are part of the nationwide marketing and distribution of Plavix, a drug BMS researched and developed, that gave rise to all the plaintiffs' claims.

BMS relies on two cases to contend that California courts may not exercise specific jurisdiction over a nonresident defendant sued by a nonresident plaintiff for injuries occurring outside the state. But in both cases, the defendant company conducted no business in California and had no employees here. (*Fisher Governor Co. v. Superior Court* (1959) 53 Cal.2d 222, 224 [the defendant had "no employees or property in California and has not appointed an agent to receive service of process here"]; *Boaz v. Boyle & Co.* (1995) 40 Cal.App.4th 700, 715 (*Boaz*) [the defendant had "not been licensed to do business in California, and . . . had neither salespersons, employees or representatives here, nor any offices, bank accounts, records or property in this state"].)

Our dissenting colleagues also rely on *Boaz* and a pharmaceutical case from the First Circuit, *Glater v. Eli Lilly & Co.* (1st Cir. 1984) 744 F.2d 213, which held that specific jurisdiction had not been established because the plaintiff's cause of

action did not "arise from" the company's forum activities. (*Id* at p. 216.) Although the facts of *Glater* are also involve the sales and marketing of an allegedly defective drug, the pharmaceutical company's contacts with the forum state, New Hampshire, appear to have been far less substantial than BMS's contacts to California. [3]

Moreover, none of these cases had the benefit of our reasoning in *Vons*, where we made clear that we had adopted a sliding scale approach to specific jurisdiction in which we recognized that "the more wide ranging the defendant's forum contacts, the more readily is shown a connection between the forum contacts and the claim." (*Vons*, *supra*, 14 Cal.4th at p. 455.) As previously described, BMS's contacts with California are substantial and the company has enjoyed sizeable revenues from the sales of its product here — the very product that is the subject of the claims of all of the plaintiffs. BMS's extensive contacts with California establish minimum contacts based on a less direct connection between BMS's forum activities and plaintiffs' claims than might otherwise be required.

In sum, taking into account all of BMS's activities in this state and their relation to the causes of action at issue here, we conclude that the second element of specific jurisdiction is met, and hence, absent a showing to the contrary by

---

[3]    In addition, the dissent relies on *Hanson v. Denckla* (1958) 357 U.S. 235, where the plaintiffs filed suit in Florida against a Delaware-based trustee who had no purposeful contacts with Florida, other than those caused by the unilateral activity of the plaintiffs. The dissent's reliance on this case is inapposite because the high court concluded that the defendant in that matter had not purposefully availed herself "of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." (*Id*. at p. 253.) Here, the parties do not contest that BMS has purposefully availed itself of California law.

BMS, it would be consistent with due process for it to be subject to litigation in this state concerning injuries allegedly caused by its product Plavix, including those injuries occurring out of state. Not only did BMS purposefully avail itself of the benefits of California by its extensive marketing and distribution of Plavix in this state and by contracting with a California distributor and employing hundreds of California-based salespersons, resulting in its substantial sales of that product here, but the company also maintains significant research and development facilities in California. All of plaintiffs' claims either arose from these activities or are related to those activities. The circumstance that numerous nonresident plaintiffs have filed their claims alongside those of resident plaintiffs does not alter or detract from this substantial nexus.

As previously discussed, the due process protections afforded by the doctrine of specific jurisdiction are designed to give a potential nonresident defendant adequate notice that it is subject to suit there, and, accordingly, a prospective defendant can assess the extent of that risk and take measures to mitigate such risk or eliminate it entirely by severing its connection with the state. (*World-Wide Volkswagen*, *supra*, 444 U.S. at p. 297.) Indeed, far from taking measures to mitigate the risk of suit in particular forums, BMS embraced this risk by coordinating a single nationwide marketing and distribution effort and by engaging in research and development in California. In that regard, BMS was on notice that it could be sued in California by nonresident plaintiffs. In fact, our courts have frequently handled nationwide class actions involving numerous nonresident plaintiffs. (See *Discover Bank v. Superior Court* (2005) 36 Cal.4th 148; *Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 915; *Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036; *Rutledge v. Hewlett-Packard Co.* (2015) 238 Cal.App.4th 1164; *Canon U.S.A., Inc. v. Superior Court* (1998) 68 Cal.App.4th 1.)

To the extent that BMS's arguments imply that a California court lacks personal jurisdiction over BMS to adjudicate the claims of the nonresident plaintiffs simply because the nonresident plaintiffs have no connection to and did not suffer any Plavix-related injuries in the state, the high court has repeatedly rejected such a focus. The minimum contacts test assesses "the relationship among the defendant, the forum, and the litigation." (*Shaffer v. Heitner*, *supra*, 433 U.S. at p. 204.) As the high court explicitly declared in *Keeton*, a "plaintiff's residence in the forum State is not a separate requirement, and lack of residence will not defeat jurisdiction established on the basis of defendant's contacts." (*Keeton*, *supra*, 465 U.S. at p. 780; see also *Walden v. Fiore*, *supra*, 571 U.S. ___, ___ [134 S.Ct. 1115, 1126] ["it is the defendant, not the plaintiff or third parties, who must create contacts with the forum State"]; *Helicopteros*, *supra*, 466 U.S. at p. 412, fn. 5 [the plaintiffs' "lack of residential or other contacts with Texas of itself does not defeat otherwise proper jurisdiction"]; *Calder v. Jones* (1984) 465 U.S. 783, 788 [the "plaintiff's lack of 'contacts' will not defeat otherwise proper jurisdiction"]; *Rush v. Savchuk* (1980) 444 U.S. 320, 332 ["the plaintiff's contacts with the forum" cannot be "decisive in determining whether the defendant's due process rights are violated"]; see also *Epic Communications, Inc. v. Richwave Technology, Inc.* (2009) 179 Cal.App.4th 314, 336 ["We fail to see how the non-California residency of plaintiff can make a 'compelling case' " with respect to any of the factors supporting personal jurisdiction].)

Finally, BMS and our dissenting colleagues further allege that permitting the exercise of specific jurisdiction in California for the claims of nonresidents based on the company's nationwide sales and marketing would effectively subvert the holding of *Daimler*, *supra*, 571 U.S. ___ [134 S.Ct. 746], in which the court refused to base jurisdiction merely on nationwide sales. But BMS's argument overstates the effect of our conclusion that specific jurisdiction is properly

28

exercised here. Our decision does not render California an all-purpose forum for filing suit against BMS for *any* matter, regardless of whether the action is related to its forum activities. Rather, as with any matter concerning specific jurisdiction, the minimum contacts test is applied on a case-by-case basis, focusing on the nature and quality of the defendant's activities in the state. (*Burger King*, *supra*, 471 U.S. at pp. 474-475.) We simply hold under this specific set of circumstances that, for purposes of establishing the requisite minimum contacts, plaintiffs' claims concerning the allegedly defective design and marketing of Plavix bear a substantial nexus with or connection to BMS's extensive contacts with California as part of Plavix's nationwide marketing, its sales of Plavix in this state, and its maintenance of research and development facilities here so as to permit specific jurisdiction.

4. *The reasonableness of specific jurisdiction*

As previously described, after a plaintiff meets the burden of showing that a defendant has purposefully established minimum contacts with the forum state, the burden then shifts to the defendant to show that the assertion of specific jurisdiction is unreasonable because it does not comport with " 'traditional notions of fair play and substantial justice.' " (*International Shoe*, *supra*, 326 U.S. at p. 316.) BMS does not argue that the assertion of jurisdiction in this case would be fundamentally unfair, but does advance several arguments it contends defeat the claim that their causes of action arose from or are related to its contacts with California. Analytically, these arguments are more pertinent to consideration of whether the exercise of specific jurisdiction is reasonable, not whether the contested claims arise from or relate to the company's forum activities. The questions raised by BMS — whether California has an interest in litigating the claims of nonresidents, whether BMS will unfairly bear a disproportionate burden

29

of defending itself against all nationwide claims in a single venue of relatively few resident plaintiffs, and whether California should expend its judicial resources on the claims of nonresident plaintiffs — are all circumstances relevant to the issue of whether BMS has established that the exercise of jurisdiction is unreasonable. They do not bear upon the issue of whether the nonresident plaintiffs' claims arise from or are related to BMS's activities in the forum state. Accordingly, we will examine these arguments using the criteria governing reasonableness.

In determining whether the defendant has established that the exercise of specific jurisdiction is unreasonable, the court "must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." (*Asahi*, *supra*, 480 U.S. at p. 113.) Although it must also weigh in its determination "the interstate judicial system's interest in obtaining the most efficient resolution of controversies[,] and the shared interest of the several States in furthering fundamental substantive social policies " (*World-Wide Volkswagen*, *supra*, 444 U.S. at p. 292), a requirement that may "reflect[] an element of federalism and the character of state sovereignty vis-à-vis other States" (*Insurance Corp. v. Compagnie des Bauxites* (1982) 456 U.S. 694, 703, fn. 10), the due process clause "is the only source of the personal jurisdiction requirement." (*Id.* at p. 703, fn. 10.) Accordingly, "[t]he relationship among the defendant, the forum, and the litigation, rather than the mutually exclusive sovereignty of the States . . . [is] the central concern of the inquiry into personal jurisdiction." (*Shaffer v. Heitner*, *supra*, 433 U.S. at p. 204.)

> *a. The burden on defendant in litigating the claims in California*

BMS complains that joining the claims of the nonresident plaintiffs to those of the comparatively smaller group of California plaintiffs would unfairly distribute the company's burden of defending this mass tort action by requiring it

to defend itself against all nationwide claims in a forum where only a minor portion of its sales occurred. However, as the Court of Appeal noted, regardless of whether California exercises jurisdiction over nonresident plaintiffs' claims, BMS is already burdened by having to defend against the claims of 86 California plaintiffs. Certainly, the addition of 592 nonresident plaintiffs is a significant added burden, but the alternative is to litigate the claims of these other 592 nonresident plaintiffs in a scattershot manner in various other forums, in potentially up to 34 different states.[4] Such an alternative would seem to be a far more burdensome distribution of BMS's resources in defending these cases than defending them in a single, focused forum.

Pretrial preparation and discovery concerning plaintiffs' claims may pose challenges given the diversity of their states of residence, but, as the Court of Appeal recognized, our state's Civil Discovery Act provides for taking depositions outside California for use at trial. (Code Civ. Proc., § 2026.010.) Moreover, information and documents relevant to plaintiffs' requests for discovery will likely be located in New York or New Jersey, as will the individuals whom plaintiffs are likely to seek to depose, regardless of the venue in which the plaintiffs' claims are filed.

Finally, BMS has provided no evidence to suggest that the cost of litigating plaintiffs' claims in San Francisco is excessive or unduly burdensome for BMS

---

[4] Our dissenting colleagues note that nonresident plaintiffs presumably could file their claims in Delaware or perhaps New Jersey or New York, or in federal court, where they could be coordinated as part of multidistrict litigation, but nothing requires them to choose one of these forums rather than their home states.

31

compared to any other relevant forum or forums.[5]  BMS, therefore, fails to show that its defense of plaintiffs' claims in California places on it an undue burden.

### b. *California's interest in providing a forum for plaintiffs in this case*

BMS further claims that California has no legitimate interest in adjudicating the claims of nonresidents because they have no connection to the state. Admittedly, the fact that the nonresident plaintiffs greatly outnumber the California plaintiffs does give us some pause.  But in ascertaining the reasonableness of exercising specific jurisdiction, no one factor, by itself, is determinative.  More important, there are identifiable interests our state holds in providing a forum for both the resident and nonresident plaintiffs.

First, evidence of other injuries is "admissible to prove a defective condition, knowledge, or the cause of an accident," provided that the circumstances of the other injuries are similar and not too remote.  (*Ault v. International Harvester* (1974) 13 Cal.3d 113, 121-122; see also *Elsworth v. Beech Aircraft Corp.* (1984) 37 Cal.3d 540, 555 [evidence of prior accidents involving similar airplane with identical single-engine stall-spin characteristics was admissible].)  To the extent that evidence of the injuries allegedly suffered by the nonresident plaintiffs may be relevant and admissible to prove that Plavix similarly injured the California plaintiffs, trying their cases together with those of nonresident plaintiffs could promote efficient adjudication of California residents' claims.  California, therefore, has a clear interest in providing a forum for this matter.

---

**5**     Of course, BMS is free to make such a showing on a motion asserting forum non conveniens.  (*Stangvik v. Shiley Inc.* (1991) 54 Cal.3d 744, 751.)  We merely hold that, for purposes of defeating specific jurisdiction, BMS fails to meet its burden.

This interest is further underscored by the substantial body of California law aimed at protecting consumers from the potential dangers posed by prescription medication, including warnings about serious side effects and prohibiting false and misleading labeling. (See, e.g., Bus. & Prof. Code, §§ 4070-4078.) As this court has previously recognized, "California has a strong interest in protecting its consumers by ensuring that foreign manufacturers comply with the state's safety standards." (*Asahi*, *supra*, 39 Cal.3d at p. 53.) It also bears reemphasis that there are no fewer than 250 BMS sales representatives in California. Although at this early stage of the proceedings, the record contains very little evidence concerning the promotional and distribution activities of these sales representatives, California has a clear interest in regulating their conduct.[6] (Cf. Bus. & Prof. Code, § 17500 [permitting claims by nonresidents who are deceived by representations "disseminated from" the State of California].)

In addition, California also has an interest in regulating the conduct of BMS's codefendant, McKesson Corporation, which is headquartered in California, as a joint defendant with BMS. As noted above, in *Vons*, we held that specific jurisdiction was proper over cross-defendants who entered into contracts in California that gave rise to the joint liability and the corresponding right to

---

[6] Our dissenting colleagues contend that the record does not establish that BMS's sales representatives misled nonresident physicians concerning the safety and efficacy of Plavix or that McKesson was responsible for providing Plavix to any of the nonresident plaintiffs. (Dis. opn. of Werdegar, J., *post*, at pp. 11-12.) Certainly, the existence of such evidence would lend additional support to the question of whether the claims of the nonresident plaintiffs are not just related to but actually also arise out of BMS's contacts with California. But our discussion here is merely focused on the reasonableness of asserting specific jurisdiction in this matter because our state has an interest in regulating conduct in the pharmaceutical industry that could pose a danger to public welfare, regardless of residency.

indemnification on which the cross-claims against them were based. (See *Vons, supra,*14 Cal.4th at pp. 456-457.) California's interest in adjudicating claims on which McKesson Corporation, a California resident, may be jointly liable with BMS, a nonresident defendant, is readily apparent. Were BMS dismissed from nonresident plaintiffs' cases, California courts would be required to hear their claims against McKesson Corporation while the same plaintiffs litigated the same claims arising from the same facts and the same evidence against BMS in a forum potentially on the opposite side of the country.

### c. *Plaintiffs' interest in a convenient and effective forum*

Nonresident plaintiffs have obviously purposefully availed themselves of the jurisdiction of courts in this state by choosing to file all of their claims here — strong evidence that the forum is convenient to them. Eighty-six of the 678 plaintiffs reside in California; only Texas, with 92 plaintiffs, is home to more.

Moreover, the current forum, San Francisco Superior Court, is equipped with a complex litigation department that is well suited to expeditiously handle such large cases. BMS has not shown that this forum is inconvenient for plaintiffs.

### d. *Judicial economy and the shared interests of the interstate judicial system*

BMS argues that it would be a waste of California's judicial resources to provide a forum for the nonresident plaintiffs. To be sure, a single court hearing the claims of hundreds of plaintiffs is a significant burden on that court. But the overall savings of time and effort to the judicial system, both in California and interstate, far outweigh the burdens placed on the individual forum court. The alternative that BMS proposes would result in the duplication of suits in in numerous state or federal jurisdictions at substantial costs to both the judicial system and to the parties, who would have to deal with disparate rulings on otherwise similar procedural and substantive issues.

34

For claims of mass injuries stemming from a single product or event, plaintiffs often resort to the mechanism of the class action, which promotes "efficiency and economy of litigation." (*Crown, Cork & Seal Co. v. Parker* (1983) 462 U.S. 345, 349.)  But, unlike class actions in which common questions of law, fact, and proximate cause predominate among members of the plaintiff class, "mass-tort actions for personal injury most often are not appropriate for class action certification." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1123.)  As this court has previously recognized, "[t]he major elements in tort actions for personal injury — liability, causation, and damages — may vary widely from claim to claim, creating a wide disparity in claimants' damages and issues of defendant liability, proximate cause, liability of skilled intermediaries, comparative fault, informed consent, assumption of the risk and periods of limitation." (*Ibid*.)

Yet, because mass tort injuries may involve diverse injuries or harm not amenable to the efficiency and economy of a class action, they present special problems for the proper functioning of the courts and the fair, efficient, and speedy administration of justice.  Without coordination, "those who win the race to the courthouse [and] bankrupt a defendant early in the litigation process" would recover but effectively shut out other potential plaintiffs from any recovery. (*In re Exxon Valdez* (9th Cir. 2000) 229 F.3d 790, 795-796.)  Moreover, coordinated mass tort actions "also avoid the possible unfairness of punishing a defendant over and over again for the same tortious conduct." (*Id*. at p. 796.)

It is also important to note that many of the resident plaintiffs allege that Plavix caused them to suffer heart attacks, strokes, cerebral bleeding, and gastrointestinal bleeding.  These are obviously severe medical conditions, and California has an interest in ensuring that litigation brought by its residents is resolved in a timely fashion.  By separating the nonresident plaintiffs from the

35

resident plaintiffs and forcing the nonresidents to sue in other states, it is fair to anticipate delays in the California proceedings that would be created by the litigation and appeals of discovery and factual conflicts in the various other forums. In that event, the California plaintiffs' litigation could be stalled for a significant period without resolution. Likewise, defendants would suffer the costs created by delay and uncertainty as to their potential liability, if any.

Moreover, the same concerns of delay and efficiency apply equally to the interstate judicial system. The other forums have an equally strong interest in the fair, efficient, and speedy administration of justice for both their resident plaintiffs and resident defendants. The consolidation of plaintiffs' claims in a single forum is a mechanism for promoting those interests.

Of course, the other potential forums also have a sovereign interest in seeing their laws applied to actions such as this one. But for purposes of establishing the propriety of personal jurisdiction, the high court has stated, "we do not think that such choice-of-law concerns should complicate or distort the jurisdictional inquiry." (*Keeton*, *supra*, 465 U.S. at p. 778.) Choice-of-law concerns might very well make a mass tort action unmanageable in certain circumstances, but that issue is not determinative at this stage of the proceedings.

Accordingly, BMS has failed to carry its burden of showing that the exercise of personal jurisdiction over it in this matter is unreasonable.

### III. CONCLUSION

We conclude that BMS, despite its significant business and research activities in California, is not at home in our state for purposes of asserting general personal jurisdiction over it. However, we conclude that in light of BMS's extensive contacts with California, encompassing extensive marketing and distribution of Plavix, hundreds of millions of dollars of revenue from Plavix sales, a relationship with a California distributor, substantial research and development facilities, and

36

hundreds of California employees, courts may, consistent with the requirements of due process, exercise specific personal jurisdiction over nonresident plaintiffs' claims in this action, which arise from the same course of conduct that gave rise to California plaintiffs' claims: BMS's development and nationwide marketing and distribution of Plavix. BMS cannot establish unfairness: Balancing the burdens imposed by this mass tort action, and given its complexity and potential impact on the judicial systems of numerous other jurisdictions, we conclude that the joint litigation of the nonresident plaintiffs' claims with the claims of the California plaintiffs is not an unreasonable exercise of specific jurisdiction over defendant BMS.

## IV. DISPOSITION

The judgment of the Court of Appeal is affirmed.

CANTIL-SAKAUYE, C. J.

WE CONCUR:

LIU, J.
CUÉLLAR, J.
KRUGER, J.

37

**DISSENTING OPINION BY WERDEGAR, J.**

The court holds today that 592 plaintiffs residing in states other than California may sue Bristol-Myers Squibb Company (BMS) in a California superior court for injuries resulting from these plaintiffs' use in their own states of BMS's prescription drug, Plavix. Because BMS is not incorporated or based in California, its activities in the state are insufficient to establish general personal jurisdiction—jurisdiction for disputes unrelated to the company's California activities—over it in California courts. (Maj. opn., *ante*, at p. 2.) The majority, however, finds BMS's California contacts sufficient for specific, case-related personal jurisdiction, even though Plavix was not developed or manufactured in California and the nonresident plaintiffs did not obtain the drug through California physicians or from a California source, and despite the requirement for specific jurisdiction that there be a substantial connection between the plaintiff's claim and the defendant's forum activities. (*Id.* at pp. 16–28; see *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 452 (*Vons*).)

I respectfully dissent from the court's decision on personal jurisdiction. I agree the extent and type of contacts to support general jurisdiction are lacking. But I find in the record no evidence of contacts with California that bear a substantial connection to the claims of these nonresidents. I therefore would hold specific jurisdiction has also not been established.

On a defendant's motion to quash service of process, the plaintiff asserting jurisdiction bears the burden of proving the extent of the defendant's forum contacts and their relationship to the plaintiff's claims. (*Vons*, *supra*, 14 Cal.4th at p. 449; *Gilmore Bank v. AsiaTrust New Zealand Ltd.* (2014) 223 Cal.App.4th 1558, 1568.) In this case, the nonresident plaintiffs (real parties in interest on BMS's petition for writ of mandate) have failed to show *any* substantial nexus, causal or otherwise, between their claims and BMS's activities in California.

One can imagine a number of factual circumstances that might justify specific jurisdiction in a case like this. Unfortunately, none of those circumstances have been established here:

If real parties in interest had purchased Plavix while in California or from a California source, their claims could be considered substantially related to BMS's sale of Plavix in this state. *But the record contains no evidence connecting the Plavix taken by any of the nonresident plaintiffs to California.*

If real parties had been prescribed Plavix by a California doctor, their misrepresentation claims might be considered substantially related to BMS's marketing of Plavix to physicians here. *But there is no evidence of a California connection through real parties' prescribing physicians*.

If the Plavix taken by real parties had been manufactured in California, one might well consider their defective product claims substantially connected to BMS's forum contacts. *But the record shows Plavix has never been manufactured in California.*

If the Plavix taken by real parties had been distributed to their respective states by codefendant McKesson Corporation, which is headquartered in San Francisco, it could be argued real parties' defective product claims were related to the distribution agreement between BMS and McKesson. *But real parties have*

*adduced no evidence to show how or by whom the Plavix they took was distributed to the pharmacies that dispensed it to them.*

If Plavix had been developed in California, real parties' defective product claims could be considered related to that California activity. *But the record shows Plavix was developed not in California but in New York and New Jersey, where BMS has, respectively, its headquarters and major operating facilities.*

If the labeling, packaging, or regulatory approval of Plavix had been performed in or directed from California, some of real parties' misrepresentation claims would arguably be related to those California activities. *But BMS did none of those things in California.*

Finally, if the "nationwide marketing" campaign on which the majority relies (maj. opn., *ante*, at p. 27) had been created or directed from California, claims of misrepresentations in that marketing would have arisen from BMS's California contacts. *But according to the record, none of that marketing work was performed or directed by BMS's California employees.*

In the absence of a concrete factual relationship between their claims and BMS's contacts with the forum state, on what do real parties, and the majority of this court, base their argument for specific jurisdiction over BMS in California courts? In brief, their argument rests on similarity of claims and joinder with California plaintiffs. First, real parties' claims arise from activities *similar* to those BMS conducted in California, because in marketing and selling Plavix throughout the United States, BMS sold the same allegedly defective product in California as in real parties' various states of residence and presumably made some of the same misrepresentations and omissions in those states and in California. Second, real parties are *joined* in this action with plaintiffs who are California residents and who allege similar claims. Neither of these factors,

3

however, creates a connection between real parties' claims of injury and BMS's California activities sufficient to satisfy due process.

By statute, the personal jurisdiction of California courts extends to the limits set by the state and federal Constitutions. (Code Civ. Proc., § 410.10.) Constitutional due process limits dictate that in the absence of general jurisdiction—which exists only if a corporation is incorporated in the forum state or conducts such intensive activities there as to make it "at home" in that state (*Goodyear Dunlop Tires Operations, S.A. v. Brown* (2011) 564 U.S. 915, 919 (*Goodyear*))—personal jurisdiction over the corporation to adjudicate a particular claim (specific jurisdiction) is established only if the controversy "is related to or 'arises out of' " the company's activities in the forum state. (*Helicopteros Nacionales de Colombia v. Hall* (1984) 466 U.S. 408, 414 (*Helicopteros*).)

The majority's decision is not supported by specific jurisdiction decisions from the United States Supreme Court, this court, or the lower federal and state courts. (See pt. I, *post*.) And as I will discuss later (see pt. II, *post*), today's decision impairs important functions of reciprocity, predictability, and limited state sovereignty served by the relatedness requirement. By weakening the relatedness requirement, the majority's decision threatens to subject companies to the jurisdiction of California courts to an extent unpredictable from their business activities in California, extending jurisdiction over claims of liability well beyond our state's legitimate regulatory interest.

Just as important, minimizing the relatedness requirement undermines an essential distinction between specific and general jurisdiction. In *Daimler AG v. Bauman* (2014) 571 U.S.\_\_\_, \_\_\_ [187 L.Ed.2d 624, \_\_\_, 134 S.Ct. 746, 751], the United States Supreme Court made clear that general jurisdiction—jurisdiction to adjudicate controversies unrelated to the defendant's forum contacts—is not created merely by commercial contacts that are "continuous and systematic"

4

(*Helicopteros*, *supra*, 466 U.S. at p. 416) but only by contacts so extensive as to render the defendant " 'at home' " in the forum state. (*Daimler*, *supra*, 187 L.Ed.2d at p. 761.) The majority applies that holding to conclude, correctly, that general jurisdiction is lacking here. (Maj. opn., *ante*, at pp. 13–16.) But by reducing relatedness to mere similarity and joinder, the majority expands specific jurisdiction to the point that, for a large category of defendants, it becomes indistinguishable from general jurisdiction. At least for consumer companies operating nationwide, with substantial sales in California, the majority creates the equivalent of general jurisdiction in California courts. What the federal high court wrought in *Daimler*—a shift in the general jurisdiction standard from the "continuous and systematic" test of *Helicopteros* to a much tighter "at home" limit—this court undoes today under the rubric of specific jurisdiction.

## I. The Case Law Does Not Support Specific Jurisdiction in These Circumstances

Specific jurisdiction over a defendant—jurisdiction to adjudicate a dispute connected to the defendant's contacts with the forum state—depends on the relationship among the defendant, the forum, and the litigation. (*Helicopteros*, *supra*, 466 U.S. at p. 414.) We have summarized the requirements for specific jurisdiction as threefold: (1) the defendant has purposefully availed itself of forum benefits; (2) the controversy arises out of or is otherwise related to the defendant's forum contacts; and (3) the assertion of personal jurisdiction in the particular litigation is reasonable in light of the burdens and benefits of forum litigation. (*Snowney v. Harrah's Entertainment, Inc.* (2005) 35 Cal.4th 1054, 1062 (*Snowney*).)

BMS contests neither the first prong of this tripartite test, that the company has purposefully availed itself of forum benefits by its continuous course of substantial business activities in California, nor the third, that taking jurisdiction

5

would impose unreasonable burdens on the company. (*Snowney*, *supra*, 35 Cal.4th at p. 1070.) The key issue here is therefore whether the claims of the real parties in interest (plaintiffs residing in states other than California) arise out of, or are otherwise related to, BMS's activities in California.

### A. *The Relatedness Requirement for Specific Jurisdiction*

The requirement that the litigation be related to the defendant's activities in or directed to the forum, by which it has purposefully availed itself of the benefits of doing business in the state, was first stated in the landmark decision of *Internat. Shoe Co. v. Washington* (1945) 326 U.S. 310 (*International Shoe*). The high court first noted that jurisdiction is well established when a corporation's "continuous and systematic" activities in the state "give rise to the liabilities sued on." (*Id.* at p. 317.) Even when a corporation has engaged in only occasional activities in the state, due process may still be satisfied if those activities have created the obligations sued on: "[T]o the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations, and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue." (*Id.* at p. 319.)

In *International Shoe* itself, the relationship between the forum activities and the litigation was a straightforward one: The defendant corporation had employed salesmen in the State of Washington, which required it contribute to the state's unemployment compensation fund; the litigation concerned an assessment for unpaid contributions. (*International Shoe*, *supra*, 326 U.S. at pp. 312–313.) Thus "the obligation which is here sued upon arose out of those very [forum] activities,"

6

making it reasonable for Washington "to enforce the obligations which appellant has incurred there." (*Id.* at p. 320.)

The United States Supreme Court has not, since *International Shoe*, greatly elaborated on its understanding of the relatedness requirement. The court in *Helicopteros* slightly reformulated the requirement: jurisdiction may be appropriate if the controversy "arise[s] out of or relate[s] to" the company's forum contacts. (*Helicopteros*, *supra*, 466 U.S. at p. 414.) But the high court did not explain or apply that standard in *Helicopteros*, and in *Goodyear*, *supra,* 564 U.S. at page 919, the court again used a different formulation, suggesting a narrower vision of relatedness: "Specific jurisdiction . . . depends on an 'affiliatio[n] between the forum and the underlying controversy,' principally, *activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation*." (Italics added.) The *Goodyear* court went on, very briefly, to explain why specific jurisdiction did not exist in the case before it, which involved the deaths of two North Carolina boys in an overseas bus accident: "Because the episode-in-suit, the bus accident, occurred in France, and the tire alleged to have caused the accident was manufactured and sold abroad, North Carolina courts lacked specific jurisdiction to adjudicate the controversy." (*Ibid*.) None of the injury-causing events having occurred in the forum state, the basis for specific jurisdiction was lacking.

Of the post- *International Shoe* decisions in which the high court actually found a factual basis for specific jurisdiction, each featured a direct link between forum activities and the litigation. (See *Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 479–480 [specific jurisdiction in Florida courts proper where franchise dispute "grew directly out of" contract formed between Florida franchisor and Michigan franchisee, whose breach "caused foreseeable injuries to the corporation in Florida"]; *Calder v. Jones* (1984) 465 U.S. 783, 789 [California

7

jurisdiction over writer and editor based in Florida proper for article distributed in California and defaming California resident, where the defendants' "intentional, and allegedly tortious, actions were expressly aimed at California" and they knew article "would have a potentially devastating impact" on California resident]; *Keeton v. Hustler Magazine, Inc.* (1984) 465 U.S. 770, 776–777 (*Keeton*) [specific jurisdiction in New Hampshire courts proper over Ohio corporation where corporation's sale in New Hampshire of magazine defaming the plaintiff injured her reputation in that state]; *McGee v. International Life Ins. Co.* (1957) 355 U.S. 220, 223 [specific jurisdiction in California courts proper where action was based on a life insurance contract delivered in California and on which the insured, a California resident at his death, had paid premiums from the state].) Nothing in the high court's specific jurisdiction decisions suggests an abandonment or broad relaxation of the relatedness requirement.

This court did, in *Vons*, adopt a relatively broad standard for relatedness. After canvassing formulations put forward by scholars and lower courts, we held the relationship between the defendant's forum contacts and the plaintiff's claims in litigation need not be one of proximate legal causation or even "but for" factual causation, nor need the forum contacts be substantively relevant in the plaintiff's action. (*Vons*, *supra*, 14 Cal.4th at pp. 460–475.) Rather, the relationship required for specific jurisdiction exists if the claims bear a "substantial nexus or connection" to the activities by which the defendant has purposefully availed itself of forum benefits. (*Id.* at p. 456; accord, *Snowney*, *supra*, 35 Cal.4th at pp. 1067–1068.) The test is not a mechanical one, but a weighing process in which "the greater the intensity of forum activity, the lesser the relationship required between the contact and the claim." (*Vons, supra,* at p. 453; accord, *Snowney, supra,* at p. 1068.) Specific jurisdiction in California courts is proper if "because of the defendants' relationship with the forum, it is not unfair to require that they answer

8

in a California court for an alleged injury that is substantially connected to the defendants' forum contacts." (*Vons, supra,* at p. 453.)

Notwithstanding our relatively broad substantial connection standard, mere similarity of claims is an insufficient basis for specific jurisdiction. The claims of real parties in interest, nonresidents injured by their use of Plavix they purchased and used in other states, in no sense arise from BMS's marketing and sales of Plavix in California, or from any of BMS's other activities in this state. Nor is any other substantial connection apparent.

BMS promoted and sold Plavix in this state, giving rise to the California plaintiffs' claims. BMS also engaged in such promotion and sales in many other states, giving rise to claims by residents of those states. As all the claims derive from similar conduct and allege similar injuries, the nonresident plaintiffs' claims closely resemble those made by California residents. But I can perceive no substantial nexus between the nonresidents' claims and BMS's California activities. In each state, the company's activities are connected to claims by those who obtained Plavix or were injured in that state, but no relationship other than similarity runs between the claims made in different states. As BMS argues, its California contacts fail to "intersect" with the nonresident plaintiffs' claims.

Even a commentator "sympathetic to an expanded role for specific jurisdiction" found the approach of the Court of Appeal in this case, which the majority in this court largely replicates, so overly broad as "to reintroduce general jurisdiction by another name." (Silberman, *The End of Another Era: Reflections on* Daimler *and Its Implications for Judicial Jurisdiction in the United States* (2015) 19 Lewis & Clark L.Rev. 675, 687 (hereafter Silberman).) "A more plausible specific jurisdiction forum might be the state where the drugs were manufactured or distributed to both the California and non-California plaintiffs; all plaintiffs' claims might be said to 'arise from' such defective manufacture and

9

thereby provide an alternative single forum in which to have all the plaintiffs assert their claims.  In *Bristol-Meyers* [*sic*], no such connection to California can be established for the non-California plaintiffs.  The claims of the California and nonresident plaintiffs are merely parallel." (*Ibid.*, fn. omitted.)

One form of substantial connection between a defendant's forum activities and the claims against it exists when the forum activities are legally relevant to establish the claims. (*Vons*, *supra*, 14 Cal.4th at p. 469.)  In that situation, the forum state's interest in regulating conduct occurring within its borders is implicated, as the plaintiff is seeking to impose liability, at least in part, for acts the defendant committed in the forum state. (*Id.* at p. 472.)  But no such legal relevance connection is apparent here.  The nonresident plaintiffs' claims rest on allegations that BMS deceptively marketed and sold Plavix to them or their prescribing physicians, but, as noted earlier, the record is devoid of any suggestion, nor do real parties claim, the nonresident plaintiffs bought or were prescribed Plavix from a California source.  BMS's marketing and sales activities in California thus appear irrelevant to real parties' claims.  To quote BMS's brief, the nonresident plaintiffs' claims "would be exactly the same if BMS had never set foot in California, had never engaged in any commercial activity in California, had never sold any product here, and had engaged only non-California distributors."

In addition to its interest in regulating conduct within its borders, each state has an interest in providing a judicial forum for its injured residents, regardless of whether the conduct sued on occurred in the state. (*Vons*, *supra*, 14 Cal.4th at pp. 472–473.)  "[T]he state has a legitimate interest as sovereign in providing its residents with protection from injuries caused by nonresidents and with a forum in which to seek redress.  This assertion of sovereignty with respect to nonresident defendants is fair when those defendants have availed themselves of certain

10

benefits within the state and the claim is related to those contacts." (*Id.* at p. 473.) But reference to the state's interest in providing a forum for its residents to seek legal redress is of no help to real parties in interest here, as they are not California residents. California has no discernable sovereign interest in providing an Ohio or South Carolina resident a forum in which to seek redress for injuries in those states caused by conduct occurring outside California. A mere resemblance between the nonresident plaintiffs' claims and those of California residents creates no sovereign interest in litigating those claims in a forum to which they have no substantial connection.

The majority argues that taking jurisdiction over the nonresidents' claims furthers a California interest because evidence of their injuries may be admissible to help the California plaintiffs prove Plavix was a defective product. (Maj. opn., *ante*, at p. 32.) But admissibility of other injuries does not depend on joinder of the other injured person, as the cases the majority cites illustrate. In neither *Ault v. International Harvester* (1974) 13 Cal.3d 113 nor *Elsworth v. Beech Aircraft Corp.* (1984) 37 Cal.3d 540, where evidence of prior similar injuries was held admissible, were those injured in the prior accidents joined as parties in the action.

The majority also suggests that jurisdiction over the nonresidents' claims is proper because California law attempts to "protect[] consumers from the potential dangers posed by prescription medication." (Maj. opn., *ante*, at p. 33.) The statutes cited, however, regulate the dispensing of prescription drugs by California pharmacists (Bus. & Prof. Code, §§ 4070–4078), while the claims at issue in this case are against BMS, a drug manufacturer. Moreover, real parties in interest have neither alleged nor proven they were prescribed or furnished Plavix in California. How the cited California laws might apply to their claims is thus unclear, to say the least.

11

In the same passage, the majority implies that the activity of BMS's California sales representatives, whose representations California has an interest in regulating, might somehow be related to real parties' claims. (Maj. opn., *ante*, at p. 33.) In this instance as well, the majority ignores the complete absence of evidence showing any such relationship. Real parties in interest, who have the burden of proving forum contacts related to their claims, have not even attempted to establish that sales representatives in California misled physicians *in other states* about Plavix's efficacy and safety. While no doubt correct California has an interest in regulating dangerous conduct within our state (maj. opn, *ante*, p. 33, fn. 6), the majority neglects to explain how that interest can be served by taking jurisdiction to adjudicate the claims of persons unaffected by any such conduct.

Finally, the majority asserts that California's interest in regulating the conduct of codefendant McKesson Corporation (McKesson), a pharmaceutical distributor headquartered in California, justifies adjudicating real parties' claims against BMS in a California court. (Maj. opn., *ante*, at pp. 33–34.) Of all the majority's red herrings, this is perhaps the ruddiest. Why plaintiffs sued McKesson as well as BMS is not obvious—BMS suggests it was merely to avoid removal to federal court (see 28 U.S.C. § 1441(b)(2))—but at no point have real parties argued McKesson bore any responsibility in providing them with Plavix. In their brief on the merits, real parties contended BMS's relationship with McKesson helped BMS make substantial profits "within California," and at oral argument their attorney acknowledged he had no evidence tying McKesson to the Plavix that allegedly injured real parties outside this state. The notion of a connection between McKesson's conduct in California and the claims of real parties in interest, which arise from their acquisition and use of Plavix in other states, is purely a product of the majority's imagination.

12

Notwithstanding the majority's speculative suggestions, as far as the record shows real parties' claims arise solely from conduct in other states and do not implicate California's legitimate interest in regulating conduct within its borders.

### B. *Jurisdiction Over Liability Claims for Pharmaceutical Drugs*

Neither real parties in interest nor the majority cites any decision, state or federal, finding specific jurisdiction on facts similar to those here. In fact, courts in both systems have *rejected* jurisdiction over drug defect claims made by plaintiffs who neither reside in nor were injured by conduct in the forum state.

In *Boaz v. Boyle & Co.* (1995) 40 Cal.App.4th 700 (*Boaz*), a group of plaintiffs, mostly residents of New York and New Jersey, but including one California resident, sued several manufacturers of the drug DES for injuries allegedly resulting from their grandmothers' ingestion of the drug in New York. (*Id.* at p. 704.) The appellate court affirmed the dismissal of the action against defendant Emons Industries, Inc., which was not subject to California's general jurisdiction, holding the basis for specific jurisdiction was also lacking as the defendant's activities in California were unrelated to the plaintiffs' injuries. (*Id.* at p. 705.) "It is conceded that none of appellants' grandmothers, who ingested DES, did so in California. Nor did any of them acquire the product as the result of any of Emons's activities related to California. Indeed, as we have seen, none of them except [the single California resident] has any connection with this state." (*Id.* at p. 718.) Though the defendant had sold DES in California as it had in other states, that similarity of conduct did not subject it to personal jurisdiction for the purposes of adjudicating the out-of-state plaintiffs' claims, though, as the court noted, jurisdiction might be appropriate "in a case arising out of ingestion in California or

13

by purchase or prescription in California of DES." (*Id.* at p. 721.)[1]  As in the present case, none of those facts had been or could be established.

*Glater v. Eli Lilly & Co.* (1st Cir. 1984) 744 F.2d 213, presented a similar fact pattern in an individual suit.  The plaintiff there sued a DES manufacturer in a federal court in New Hampshire for injuries she allegedly suffered from *in utero* exposure to the drug.  The plaintiff's mother took the drug in Massachusetts, where she lived.  (*Id.* at p. 214.)  That the manufacturer had marketed DES nationwide, including in New Hampshire, was insufficient to support specific jurisdiction:  Although Lilly marketed and sold DES nationwide, including in New Hampshire, "Glater's cause of action did not arise from Lilly's New Hampshire activities; rather, her injuries were caused in Massachusetts by exposure *in utero* to DES which her mother purchased and consumed in Massachusetts."  (*Id.* at p. 216.)  Were the defendant's New Hampshire contacts deemed sufficiently related to the cause of action arising in Massachusetts, the court "would be obliged to hold that *any* plaintiff in Glater's position—a nonresident injured out of state by a drug sold and consumed out of state—could bring suit in New Hampshire for DES injuries."  (*Id.* at p. 216, fn. 4.)  Such "retributive jurisdiction" over claims

---

[1]     As to the California resident, the *Boaz* court reasoned jurisdiction was lacking because her grandmother had not taken DES in California and therefore "any DES-related affliction she suffers has nothing to do with any of Emons's activities related to California."  (*Boaz*, *supra*, 40 Cal.App.4th at p. 718.)  The court may have gone too far in this respect; California's interest in providing a forum for its residents to seek redress for actions having injurious effects in the state arguably justified specific jurisdiction over the California resident's claims.  For the same reason, *In re DES Cases* (E.D.N.Y. 1992) 789 F.Supp. 552 can be distinguished as involving the claims of New York residents seeking a remedy for injuries occurring in New York; although the defendants challenging jurisdiction there did not market DES in New York, they bore legal responsibility for injuries there under the state's rule of market share liability.  (See *id.* at pp. 592–593.)

14

unconnected to the forum "comports with neither logic nor fairness." (*Ibid.*; accord, *Seymour v. Parke, Davis & Company* (1st Cir. 1970) 423 F.2d 584, 585, 587 [suit in New Hampshire over drug taken and allegedly causing injury in Massachusetts "did not arise [in New Hampshire], or as a result of anything which occurred there" and hence was an "unconnected cause[] of action" that could only be justified by general jurisdiction, the basis for which was also lacking].)

Also similar, though less extensively reasoned as to specific jurisdiction, is *Ratliff v. Cooper Laboratories, Inc.* (4th Cir. 1971) 444 F.2d 745.  That decision addressed two consolidated cases brought in a federal court in South Carolina, both by residents of other states who bought and consumed the allegedly harmful drugs (not named in the decision), against drug manufacturers that conducted business in South Carolina but were not incorporated or headquartered there and had not made the subject drugs there.  (*Id.* at p. 746.)  The court observed that the plaintiffs were not residents of South Carolina and their causes of action "arose outside the forum and were unconnected with the defendant's activities in South Carolina." (*Id.* at p. 747.)  Noting "the lack of a 'rational nexus' between the forum state and the relevant facts surrounding the claims presented" such as would support specific jurisdiction, the court moved on to general jurisdiction (for which it also found the forum contacts insufficient).  (*Id.* at p. 748.)

In all these cases, the defendants had sold their pharmaceutical drugs in the forum state.  Indeed, in *Boaz*, California physicians accounted for 9 percent of the defendant's DES sales.  (*Boaz*, *supra*, 40 Cal.App.4th at p. 715.)[2]  Yet these

---

[2]    The majority (maj. opn., *ante*, at p. 25) notes that the defendant in *Boaz*, unlike BMS, did not employ salespeople or maintain offices in the state.  Yet through "advertising in selected professional magazines and professional journals, and targeted mailings of samples and brochures to obstetricians and gynecologists," all "done on a national scale" (*Boaz*, *supra*, 40 Cal.App.4th at

*(footnote continued on next page)*

15

courts— correctly, in my view— considered that forum activity to be unconnected to the plaintiffs' claims, which arose from use of the drugs in other states. Not until today's decision has specific jurisdiction over a drug liability claim arising from the nonresident plaintiff's purchase, use, and injury *outside* the forum state been premised on the fact that the defendant *also* sold the drug in the forum state.

### C. Specific Jurisdiction Decisions Relied on by Real Parties

Turning from pharmaceutical liability to the broader case law, we see that none of the decisions real parties cite support specific jurisdiction based, as here, on the mere *resemblance* between the disputed claims and distinct claims brought by other plaintiffs that arose from the defendant's forum contacts. Each of these cited cases involved a substantial connection between the defendant's activities in the forum state and the plaintiff's claims, not merely a connection between the forum activities and similar claims made by other plaintiffs.

In *Cornelison v. Chaney* (1976) 16 Cal.3d 143 (*Cornelison*), a California resident sued for the wrongful death of her husband, who died in an automobile accident in Nevada. The defendant, a Nebraska resident, was a trucker hauling goods in interstate commerce. He made approximately 20 trips to California each year and was en route to this state with a shipment when his truck collided with the decedent's vehicle in Nevada, near the California border. (*Id.* at pp. 146–147.)

We concluded the plaintiff's cause of action did bear a substantial connection to the defendant's business activities in California: "As we have seen, defendant

---

*(footnote continued from previous page)*

p. 715), the company sold a large amount of DES—the same product at issue in the disputed lawsuits—in California. Like BMS, then, the defendant in *Boaz* "enjoyed sizeable revenues from the sales of its product here." (Maj. opn., *ante*, at p. 26.) Why the absence of other, dissimilar ties should serve to distinguish the case is unclear.

16

has been engaged in a continuous course of conduct that has brought him into the state almost twice a month for seven years as a trucker under a California license. The accident occurred not far from the California border, while defendant was bound for this state. He was not only bringing goods into California for a local manufacturer, but he intended to receive merchandise here for delivery elsewhere. The accident arose out of the driving of the truck, the very activity which was the essential basis of defendant's contacts with this state. These factors demonstrate, in our view, a substantial nexus between plaintiff's cause of action and defendant's activities in California." (*Cornelison*, *supra*, 16 Cal.3d at p. 149.) In further support, we observed that California had an interest in providing a forum for the litigation because the plaintiff was a California resident. (*Id.* at p. 151.)

*Cornelison* has in common with the present case that the plaintiff's injury arose directly from the defendant's conduct outside California. But in *Cornelison* the defendant's out-of-state conduct, his allegedly negligent driving in Nevada, was directed (literally) toward California and resulted in injury to a California resident. The connections to California that justified jurisdiction in *Cornelison* are missing from the claims of real parties in interest here.

In *Vons*, *supra*, 14 Cal.4th 434, we held specific jurisdiction proper over two restaurant franchisees based and operating in Washington State. In multiparty litigation arising out of food poisoning incidents at their and other Jack-in-the-Box restaurants, the supplier of the allegedly tainted meat (Vons Companies, Inc. (Vons)) cross-complained against several franchisees, including the Washington franchisees, alleging their failure to cook the meat properly caused the poisoning. (*Id.* at pp. 440–441.) Among other contacts with California, the franchisees had executed the franchise agreements, which specified methods of preparing Jack-in-the-Box food products, in California, did regular business with the franchisor at its

17

headquarters in San Diego, and had officers attend training sessions offered by the franchisor in California. (*Id.* at pp. 442–443.)

We held Vons's claims against the franchisees bore a substantial relationship to their contacts with California for two reasons: first, the franchise relationship—formed in California, under which the franchisees bought meat Vons supplied to the franchisor—had drawn Vons and the franchisees into a relationship as alleged joint tortfeasors, with certain joint liabilities and rights of indemnification, rights upon which Vons' cross-complaint in part rested; second, the franchise relationship, by imposing uniform standards for cooking food, buying equipment, and training employees, was itself an alleged source of Vons' injuries, which Vons traced to the " 'systematically deficient' " procedures required by the franchisor. (*Vons*, *supra*, 14 Cal.4th at pp. 456–457.)

Real parties in interest rely on *Vons* for the propositions that for specific jurisdiction to be justified the defendant's forum activities need not be directed at the plaintiff or directly give rise to the plaintiff's claims. (See *Vons*, *supra*, 14 Cal.4th at pp. 453, 457.) Both points are well taken. Nonetheless, in *Vons* the connection between the forum activities and the claim was far more substantial than in the present case. By their activities in California, including the formation of franchise relationships, the franchisees in *Vons* established the conditions that would ultimately allow the franchisor's meat supplier, Vons, to seek indemnity for their joint liability and redress for its own injuries. The franchisees' forum activities were not directed at Vons, with which they had no direct relationship, and may not have proximately given rise to Vons's claims, but by establishing a franchise relationship pursuant to which the franchisees bought Vons's meat and prepared it according to methods set out in the franchise agreement, they set the stage for those claims, to say the least. No such nexus is apparent here, where

18

BMS's marketing and sales of Plavix in California did nothing to establish the circumstances under which it allegedly injured plaintiffs in other states.

Finally as to California cases, real parties in interest cite *Snowney*, *supra*, 35 Cal.4th 1054, in which we held a California resident could sue a group of Nevada hotels in a California court for the hotels' failure to provide notice that they would impose an energy surcharge on their room prices. (*Id.* at p. 1059.) In a relatively brief discussion of the relatedness issue (the bulk of our analysis concerned the question of purposeful availment), we held the plaintiff's claims had a substantial connection to the defendants' California forum activities because the plaintiff's false advertising and unfair competition claims were based on the hotels' alleged omissions in their California advertising and in the reservation process. (*Id.* at p. 1068.) "Because the harm alleged by plaintiff relates directly to the content of defendants' promotional activities in California, an inherent relationship between plaintiff's claims and defendants' contacts with California exists." (*Id.* at p. 1069.)

Real parties rely on *Snowney* for its adherence to the substantial connection test articulated in *Vons* and for its reiteration of *Vons*'s statements that the required intensity of forum contacts and connection of the claim to those contacts are inversely related (the greater the contacts, the less of a relationship need be shown) and that the forum contacts need not be directed at the plaintiff or give rise directly to the plaintiff's claim. (See *Snowney*, *supra*, 35 Cal.4th at p. 1068.) I find those principles unavailing in this case. However intense the defendant's activities in California, they must still bear a substantial relationship to the plaintiff's claims, and neither *Snowney* nor any of the other decisions real parties cite suggests that a mere resemblance between the plaintiff's claims and those made by other plaintiffs that are based on the defendant's California contacts establishes a substantial connection.

19

*Cornelison*, *Vons* and *Snowney* establish that we do not demand the relationship between the defendant's California contacts and the plaintiff's claims be causal or direct. They do not, however, support specific jurisdiction on the tenuous basis of a *resemblance* to other claims by other plaintiffs. (See *Greenwell v. Auto-Owners Ins. Co.* (2015) 233 Cal.App.4th 783, 801 [*Vons* and *Snowney* require a *substantial* connection between the plaintiff's claims and the defendant's forum contacts; test is not satisfied whenever there is "*any relationship at all*"].)

In *Keeton, supra*, 465 U.S. 770, the United States Supreme Court upheld the assertion of specific jurisdiction in New Hampshire to adjudicate the libel claims of a New York resident against an Ohio corporation with its principal place of business in California. (*Id.* at pp. 772–774.) The high court found the defendant's regular circulation of magazines in New Hampshire was sufficient to support the state's jurisdiction over a libel claim based on the magazine's contents, even though the plaintiff could, under the " 'single publication rule' " followed in New Hampshire, recover damages from publication of the magazine throughout the United States. (*Id.* at pp. 773–774.) The court emphasized that the plaintiff was suing, in part, for damages she suffered in New Hampshire, "[a]nd it is beyond dispute that New Hampshire has a significant interest in redressing injuries that actually occur within the State." (*Id.* at p. 776.)

Unlike the plaintiff in *Keeton*, real parties in interest suffered no injury in California or from BMS's conduct in California. They nonetheless argue *Keeton* is analogous because the plaintiff there sought recovery, in large part, for injuries incurred outside the forum state. For two reasons, however, the analogy does not hold.

First, the single publication rule at work in *Keeton* was a state law rule governing the measure of damages for defamation, not one governing the joinder

20

of claims or claimants. The propriety of that state law damages rule was not itself a jurisdictional issue; rather, the question was whether personal jurisdiction in New Hampshire violated due process *given* the state's single publication rule (and its unusually long statute of limitations). (*Keeton*, *supra*, 465 U.S. at pp. 773–774.) In contrast, BMS's motion to quash service of summons as to the claims of the nonresident plaintiffs directly presents the jurisdictional issue as to those plaintiffs. We ask whether the superior court may take jurisdiction over defendant to adjudicate those claims, and are not required to decide whether the *entire* suit, including the claims of the California residents, would be subject to dismissal for lack of jurisdiction if the nonresidents' claims were included in it.

Second, New Hampshire had an interest in adjudicating the out-of-state damages that does not translate to the factual context of this case. (See *Keeton*, *supra*, 465 U.S. at p. 777.) To prevent the extraordinary burden on courts and litigants of having a defamation plaintiff sue separately in 50 states—and to allow effective application of a statute of limitations for publications that continue or recur over lengthy periods—most states have adopted the single publication rule, allowing only a single action per publication, but one in which all damages from the publication may be recovered. (See Civ. Code, § 3425.3 [Cal. Uniform Single Publication Act]; *Christoff v. Nestlé USA, Inc.* (2009) 47 Cal.4th 468, 477–479; see also *Keeton*, *supra*, at p. 778.)

On the facts of this case, there is no analogous state interest of similar force that would justify California courts adjudicating the nonresident plaintiffs' claims. This is not a case in which the individual California plaintiffs would be stymied by procedural obstacles or restrictive damages rules were the nonresidents excluded from the action. Plaintiffs allege they suffered "severe physical, economic and emotional injuries" from their use of Plavix, including bleeding ulcers, gastrointestinal bleeding, cerebral bleeding, heart attack and stroke. Even if some

21

of the California plaintiffs might have individual claims too small to justify suit, the consolidation of scores of such claims from within California would remedy that insufficiency without the addition of hundreds of nonresidents' claims. California can thus provide an effective forum for its residents to seek redress without joining those claims to similar claims by nonresidents. Nor does this case raise the specter of a continually restarting statute of limitations that would subject defendants like BMS to the harassment of unending suits for the same conduct (see *Christoff v. Nestlé USA, Inc.*, *supra*, 47 Cal.4th at p. 478), as was the case with the defamation suit in *Keeton*.

The majority argues jurisdiction over nonresidents' claims is justified by the efficiencies of litigating all claims arising from a "mass tort" in a single forum and by the existence of a complex litigation division in San Francisco Superior Court "well suited to expeditiously handle such large cases." (Maj. opn., *ante*, at pp. 35, 34.) If these 678 plaintiffs were all the injured Plavix users in the United States, and the only options for the nonresident plaintiffs were participation in this action or individual actions in their home states, then joint proceedings in California would likely be the most efficient procedure, though the extent of that efficiency would depend on how choice of law questions are resolved, among other factors. (See Silberman, *supra*, 19 Lewis & Clark L.Rev. at p. 687 ["As for the efficiency arguments relied on by the California appeals court, only the issue of the defective quality of the drug is common to all the claims."].)

But these plaintiffs do not constitute the entire universe of those claiming injury from Plavix—far from it—and real parties' options are not limited to joining this action or each bringing separate actions in their respective states. In addition to consolidated multidistrict federal litigation in the District of New

22

Jersey, individual, mass or representative actions have been brought in several other states.**3** Whether or not real parties' claims are heard together with those of the California plaintiffs, inefficiency and the potential for conflicting rulings will exist so long as actions are simultaneously pending in several state and federal courts. (See generally Miller, *Overlapping Class Actions* (1996) 71 N.Y.U. L.Rev. 514, 520–525.)

No mechanism exists for centralizing nationwide litigation in a state court; there is no means by which pending actions in Illinois courts, for example, can be transferred to a California court. The San Francisco Superior Court, no matter how well equipped for trying complex cases, cannot adjudicate the entire dispute between injured Plavix users and BMS. If efficiency is the goal, federal litigation

---

**3** See *In re Plavix Marketing, Sales Practices and Products Liability Litigation (No. II)* (U.S. Jud. Panel Multidist. Litig. 2013) 923 F.Supp.2d 1376, 1379–1381 (centralizing in District of New Jersey litigation arising in that state and in Illinois, Iowa, Louisiana, New York, and Pennsylvania, and potentially centralizing additional actions from California and Mississippi); *Mills v. Bristol-Myers Squibb Co.* (D.Ariz., Aug. 12, 2011, No. CV 11-968-PHX-FJM) 2011 WL 3566131, at *1 (individual action); *Hawaii ex rel. Louie v. Bristol-Myers Squibb Co.* (D.Hawaii, Aug. 5, 2014, No. CIV. 14-00180 HG-RLP) 2014 WL 3865213, at *2 (parens patriae action brought by the Attorney General of Hawaii remanded to state court); *Davidson v. Bristol-Myers Squibb Co.* (S.D.Ill., Apr. 13, 2012, No. CIV. 12-58-GPM) 2012 WL 1253165, at *5 (action by 83 plaintiffs remanded to state court); *Boyer v. Bristol-Myers Squibb Co.* (S.D.Ill., Apr. 13, 2012, No. CIV. 12-61-GPM) 2012 WL 1253177, at *5 (same, as to action by 71 plaintiffs); *Anglin v. Bristol-Myers Squibb Co.* (S.D.Ill., Apr. 13, 2012, No. CIV. 12-60-GPM) 2012 WL 1268143, at *5 (same, as to action by 67 plaintiffs); *Tolliver v. Bristol-Myers Squibb Co.* (N.D.Ohio, July 30, 2012, No. 1:12 CV 00754) 2012 WL 3074538, at *1 (individual action); *Employer Teamsters-Local Nos. 175/505 Health and Welfare Trust Fund v. Bristol-Myers Squibb Co.* (S.D.W. Va. 2013) 969 F.Supp.2d 463, 466 (action by third party payors alleging misleading and false marketing of Plavix).

centralized through the multidistrict procedure offers a more promising path than a series of uncoordinated state and federal court actions.

*Keeton*, in which jurisdiction was found proper despite a state law rule allowing damages for out-of-state injuries, thus fails to support real parties' contention that jurisdiction over litigation brought by nonresident plaintiffs whose claims arose in other states may be obtained by joining their cases to similar ones brought by California plaintiffs. Such jurisdiction by joinder, moreover, would run counter to the holding of *Hanson v. Denckla* (1958) 357 U.S. 235 (*Hanson*).

In *Hanson*, the high court held a Florida court considering the validity of a trust created in Delaware did not have personal jurisdiction over the Delaware trustee, who had performed no relevant acts in Florida (357 U.S. at p. 252),[4] even though other parties to the dispute resided in Florida and could be brought before the Florida court: "It is urged that because the settlor and most of the appointees and beneficiaries were domiciled in Florida the courts of that State should be able to exercise personal jurisdiction over the nonresident trustees. This is a non sequitur. With personal jurisdiction over the executor, legatees, and appointees, there is nothing in federal law to prevent Florida from adjudicating concerning the respective rights and liabilities of those parties. But Florida has not chosen to do

---

[4]     The majority's account of *Hanson* as resting solely on the purposeful availment prong of the specific jurisdiction test (maj. opn., *ante*, at p. 26, fn. 3) is incomplete. The trust settlor in *Hanson* had moved to Florida after establishing the trust; the trustee then paid the settlor trust income in that state and received from her directions for trust administration, including the execution of two powers of appointment. (*Hanson*, *supra*, 357 U.S. at p. 252 & fn. 24.) But because the litigation concerned the validity of the trust agreement itself (*id.* at p. 253), the cause of action was "not one that arises out of an act done or transaction consummated in the forum State." *(Id.* at p. 251.) *Hanson*'s holding was thus based on the lack of a relationship between the litigation and the defendant's forum contacts as well as on the paucity of those contacts.

24

so. As we understand its law, the trustee is an indispensable party over whom the court must acquire jurisdiction before it is empowered to enter judgment in a proceeding affecting the validity of a trust. It does not acquire that jurisdiction by being the 'center of gravity' of the controversy, or the most convenient location for litigation." (*Id.* at p. 254, fn. omitted.)

It is likewise a non sequitur to argue that because many Californians have sued BMS for injuries allegedly caused by their use of Plavix, and the superior court's jurisdiction to address their claims is not disputed, the claims of nonresidents injured in other states should also be adjudicated here. California might or might not be an especially convenient and efficient forum for nationwide Plavix litigation, but joinder of California plaintiffs cannot confer personal jurisdiction over BMS to adjudicate claims that do not arise out of, and are not otherwise related to, BMS's business activities in California.

The majority posits two bases for deeming BMS's California activities related to the nonresident plaintiffs' claims. First, despite a silent factual record on this point, the majority infers that BMS employed the "same . . . assertedly misleading marketing and promotion" in California as in the states where real parties resided and were allegedly injured.[5] (Maj. opn., *ante*, at p. 23.) I have shown above that neither the case law nor an analysis of forum state interests supports basing specific jurisdiction on a similarity between activities in the forum state and those outside the forum. Characterizing BMS's multistate marketing activities as "coordinated" (maj. opn., *ante*, at p. 24) adds nothing to the

---

[5] Despite relying on BMS's nationwide marketing of Plavix as a basis for jurisdiction, and despite bearing the burden of proof on contacts and relatedness, real parties in interest introduced no evidence of particular marketing materials or broadcasts deployed in any state.

25

jurisdictional argument given that, as the majority concedes, the record shows BMS's marketing campaign for Plavix was coordinated from New York and New Jersey rather than from California. The majority's supposition that California courts have personal jurisdiction over an out-of-state defendant to adjudicate a claim arising from deceptive advertising in, say, Maryland because the defendant used a common marketing strategy in California, Maryland and other states is without rational foundation.

Nor does calling BMS's nationwide marketing of Plavix a "course of conduct" (maj. opn., *ante*, at pp. 24, 25, 36) advance the majority's cause. As already noted (fn. 5, *ante*), real parties introduced no evidence of marketing materials or broadcasts used in any state. Other than that some degree of commonality existed, which BMS conceded, the extent of marketing overlap among the states is simply unknown. Certainly, this record provides no basis for assuming that real parties and the California plaintiffs were all injured by a single television broadcast made simultaneously in every media market or a single print advertisement published simultaneous in newspapers and magazines throughout the nation. This is not a case, that is to say, of a single act injuring plaintiffs in multiple states at one blow, where the argument for common jurisdiction might be stronger. All that appears is that Plavix was marketed nationwide and that BMS may have used many of the same materials—none of them generated in California—in various states. Such similarity of causes is not sufficient to give our courts jurisdiction over all claims, wherever they arise, based on misrepresentations or omissions in a company's marketing materials.

Second, the majority notes that BMS maintains some research facilities in California, although the majority concedes Plavix was not developed in those

26

facilities.**6** (Maj. opn., *ante*, at p. 24.) This second ground of relatedness is both illogical and startling in its potential breadth. Because BMS has performed research on other drugs in California, claims of injury from Plavix may, according to the majority, be adjudicated in this state. Will we in the next case decide that a company may be sued in California for dismissing an employee in Florida because on another occasion it fired a different employee in California, or that an Illinois resident can sue his automobile insurer here for bad faith because the defendant sells health care policies in the California market? The majority points to no substantial connection between Plavix claims arising in other states and research on unspecified other products in this state.

## II. The Relatedness Requirement Serves Important Functions and Should Not Be Minimized

As shown in part I, *ante*, the case law on specific jurisdiction does not support a California court taking jurisdiction over nonresident plaintiffs' claims, arising from their use of Plavix in other states. BMS marketed and sold Plavix to other plaintiffs within California, but those forum activities are not substantially related to the nonresident plaintiffs' claims. In the absence, however, of any United States Supreme Court decisions closely on point, stare decisis does not prevent the majority from giving the relatedness requirement scant consideration, while relying on its theory that the asserted benefits of consolidating multistate claims in California outweigh the burdens for BMS of defending real parties'

---

**6** This is not a matter of the absence of evidence. In support of its motion to quash service, a BMS executive submitted a declaration stating that "none of the work to develop Plavix took place in California," and that all development, manufacture, labeling, and marketing of Plavix was performed or directed from New York or New Jersey; none was accomplished or directed by California employees.

claims here together with those of the California plaintiffs. (Maj. opn., *ante*, at pp. 29–35.) Nevertheless, this approach is, in my view, a serious mistake. By essentially ignoring relatedness and merely satisfying itself that defendant is not being haled into an inconvenient forum where it has no significant contacts, the majority blurs the distinction between general and specific jurisdiction and impairs the values of reciprocity, predictability, and interstate federalism served by due process limits on personal jurisdiction.

Reciprocity, in this context, refers to the idea that the litigation to which a defendant is exposed in a particular forum should bear some relationship to the benefits the company has sought by doing business in the state. (See Moore, *The Relatedness Problem in Specific Jurisdiction* (2001) 37 Idaho L.Rev. 583, 599 ["The party has garnered the benefits offered by the government in which the court sits. These benefits include the laws, the administrative framework and their restraining effects. In return, the party concedes to that government a quantum of power to govern his conduct, a power which he himself holds in a natural autonomous state."].) Such reciprocity is most clearly maintained by the state taking jurisdiction over disputes arising directly from the defendant's activities in the state. As the high court said in *International Shoe*, where "[t]he obligation which is . . . sued upon arose out of those very activities," it will generally be "reasonable and just . . . to permit the state to enforce the obligations which appellant has incurred there." (*International Shoe*, *supra*, 326 U.S. at p. 320.)

More broadly, enforcing a meaningful relatedness requirement ensures some degree of reciprocity; because the forum's assertion of jurisdiction cannot encompass disputes that have no substantial connection with the defendant's forum activities, the liabilities to which the defendant is exposed in the forum will tend to bear a relationship to the benefits it has sought in doing business there. "Relationship helps test whether the benefits and burdens are similar. When a suit

28

concerns the activities from which the corporation received in-state benefits, there is some similarity in the burden imposed by the assertion of jurisdiction. . . . Relatedness may be a rough measure, but it placed a logical limit on the burdens arising from in-state activities." (Andrews, *The Personal Jurisdiction Problem Overlooked in the National Debate About "Class Action Fairness"* (2005) 58 SMU L.Rev. 1313, 1345–1346 (hereafter Andrews).)

Relatedness bears on predictability in much the same way. "In order for a business to properly structure its behavior—set consumer costs, procure insurance, or sever its relationship with a particular state—it must not only know that a contact has been made in a particular state (an aim protected through the purposeful availment standard), but it also must have some minimal appreciation of the effect of that contact. The relationship standard helps give this knowledge. If a business entity chooses to enter a state on a minimal level, it knows that under the relationship standard, its potential for suit will be limited to suits concerning the activities that it initiates in the state." (Andrews, *supra*, 58 SMU L.Rev. at p. 1346; see *World-Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286, 297 (*World-Wide Volkswagen*) [observing that when a corporation sells its products in a state, "it has clear notice that it is subject to suit there," and jurisdiction over a suit would not be unreasonable "if its allegedly defective merchandise has there been the source of injury to its owner or to others."].)

Finally, limiting specific jurisdiction to litigation that is substantially connected to the defendant's forum activities prevents states from straying beyond their legitimate regulatory spheres. Appropriately limited, specific jurisdiction "acts to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." (*World-Wide Volkswagen*, *supra*, 444 U.S. at p. 292.) As the high court explained in *Hanson*, the growth in interstate commerce and the easing of communications

29

and transportation may have tempered, but they have not eliminated, the role that territorial limits on state regulation play under due process. Due process restrictions on personal jurisdiction "are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States." (*Hanson*, *supra*, 357 U.S. at p. 251.)

Expanding on this point in *World-Wide Volkswagen*, the court explained that while the Constitution's Framers foresaw a nation of economically interdependent states, they "also intended that the States retain many essential attributes of sovereignty, including, in particular, the sovereign power to try causes in their courts. The sovereignty of each State, in turn, implied a limitation on the sovereignty of all of its sister States—a limitation express or implicit in both the original scheme of the Constitution and the Fourteenth Amendment." (*World-Wide Volkswagen*, *supra*, 444 U.S. at p. 293.) Thus even in the modern era due process limits on personal jurisdiction retain a territorial aspect: "Even if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation, the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment." (*Id.* at p. 294; accord, *J. McIntyre Machinery, Ltd. v. Nicastro* (2011) 564 U.S. 873, 879 (plur. opn. of Kennedy, J.) ["The Due Process Clause protects an individual's right to be deprived of life, liberty, or property only by the exercise of lawful power. . . . This is no less true with respect to the power of a sovereign to resolve disputes through judicial process than with respect

30

to the power of a sovereign to prescribe rules of conduct for those within its sphere."].)**7**

The relatedness requirement for specific jurisdiction plays a key role in implementing these interstate federalism limits. By conducting business within a state or directing its efforts at the state, a company brings its activities within the state's core regulatory concerns. Litigation that arises from those activities falls squarely within the state's sovereign power to adjudicate. In contrast, litigation arising outside the state is unlikely to be a fit subject for state court adjudication except to the extent it involves state residents. "A state has sovereignty with regard to activity conducted within its borders, and it thus has power over claims arising from that activity. . . . A state seemingly has no sovereignty over activity that neither involves its citizens nor occurs within its borders." (Andrews, *supra*, 58 SMU L.Rev. at p. 1347.) Relatedness thus "helps limit the reach of states so that they do not exceed legitimate state interests." (*Id.* at p. 1348.) As this court remarked (in a choice of law discussion, but with equal applicability to jurisdiction), our state's legitimate regulatory interest does not ordinarily extend to measures aimed at "alter[ing] a defendant's conduct in another state vis-à-vis another state's residents." (*Kearney v. Salomon Smith Barney, Inc.* (2006) 39 Cal.4th 95, 104, italics omitted.)

---

**7** In *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee* (1982) 456 U.S. 694, 703, footnote 10, the high court noted that concern for federalism is not "an independent restriction on the sovereign power of the court," but rather "a function of the individual liberty interest preserved by the Due Process Clause," waivable by the party. Though not an independent, unwaivable restriction on jurisdiction, interstate federalism remains an important consideration in determining how the due process limits on jurisdiction should be applied. "The defendant has a due process right to have states act only within the limits of their sovereignty." (Andrews, *supra*, 58 SMU L.Rev. at p. 1347.)

Basing specific jurisdiction on mere similarity between a corporation's forum activities and those outside the state, as the majority does in this case, defeats the relatedness requirement's functions of reciprocity, predictability, and interstate federalism. If BMS must answer in a California court for Plavix claims arising across the country simply because some Californians have made similar claims, the link between the benefits BMS has sought by doing that business in the state and the liabilities to which it is exposed here has been severed. In the same way, predictability has been severely impaired, as the company's potential liabilities cannot be forecast from its state activities. And interstate federalism is perhaps most directly impaired; by taking jurisdiction to adjudicate a dispute arising only from BMS's actions in, for example, Texas, and allegedly resulting in injuries only to a Texan, the California courts infringe directly on Texas's sovereign prerogative to determine what liabilities BMS should bear for actions in its borders and injuring its residents. "[T]he forum state arguably exceeds its sovereignty when it asserts jurisdiction over claims that are merely similar to activities within its borders, as opposed to causally connected to the forum conduct." (Andrews, *supra*, 58 SMU L.Rev. at pp. 1354–1355.)

For decades, commentators have rejected similarity as an adequate criterion of connection or relatedness, recognizing that its excessive breadth would create jurisdiction in every state for every breach by a national corporation, wherever it occurred. "Thus the similarity test would apparently have to allow jurisdiction in any State in the country where the defendant has engaged in similar activities." (Brilmayer, *How Contacts Count: Due Process Limitations on State Court Jurisdiction* (1980) Sup.Ct.Rev. 77, 84; accord, Rhodes & Robertson, *Toward a New Equilibrium in Personal Jurisdiction* (2014) 48 U.C. Davis L.Rev. 207, 242 [allowing specific jurisdiction "in every forum in which the defendant conducts continuous and systematic forum activities that are sufficiently similar to the

32

occurrence in dispute . . . would give the plaintiff the choice of essentially every state for proceeding against a national corporation"].)  Today, the majority, by holding the presence of California plaintiffs with claims similar to those of real parties in interest constitutes a substantial connection between real parties' claims and BMS's California activities, effectively sanctions California courts taking jurisdiction over actions by plaintiffs throughout the nation alleging injuries from any nationwide business activity.

As California holds a substantial portion of the United States population, any company selling a product or service nationwide, regardless of where it is incorporated or headquartered, is likely to do a substantial part of its business in California.  Under the majority's theory of specific jurisdiction, California provides a forum for plaintiffs from any number of states to join with California plaintiffs seeking redress for injuries from virtually any course of business conduct a defendant has pursued on a nationwide basis, without any showing of a relationship between the defendant's conduct in California and the nonresident plaintiffs' claims.  The majority thus sanctions our state to regularly adjudicate disputes arising purely from conduct in other states, brought by nonresidents who suffered no injury here, against companies who are not at home here but simply do business in the state.

Such an aggressive assertion of personal jurisdiction is inconsistent with the limits set by due process.  Although those limits are more flexible and less strictly territorial than in the past, the high court has explained that they still act to keep any one state from encroaching on the others:  "[W]e have never accepted the proposition that state lines are irrelevant for jurisdictional purposes, nor could we, and remain faithful to the principles of interstate federalism embodied in the Constitution." (*World-Wide Volkswagen, supra*, 444 U.S. at p. 293.)  That BMS marketed and sold Plavix throughout the United States, presumably using much of

33

the same advertising in many markets, does not give California authority, under our federal system, to assert jurisdiction over claims arising throughout the nation. Speaking of the limits to jurisdiction set by interstate federalism, the court in *Boaz*—also involving a pharmaceutical drug marketed throughout the nation—observed: "We have no warrant to jettison these principles in favor of an approach which recognizes no defined limits to the assertion of jurisdiction against any defendant whose national marketing somehow affects commerce in the forum state." (*Boaz*, *supra*, 40 Cal.App.4th at p. 721.)

Assessing the fairness of specific jurisdiction " 'in the context of our federal system of government' " (*World-Wide Volkswagen, supra*, 444 U.S. at pp. 293–294), we should be restrained here by the absence of any discernable state interest in adjudicating the nonresident plaintiffs' claims. Where the conduct sued upon did not occur in California, was not directed at individuals or entities in California, and caused no injuries in California or to California residents, neither our state's interest in regulating conduct within its borders (*Vons*, *supra*, 14 Cal.4th at p. 472) nor its interest in providing a forum for its residents to seek redress for their injuries (*id.* at p. 473) is implicated. On the critical question of why a Texan's claim he was injured in Texas by taking Plavix prescribed and sold to him in Texas should be adjudicated in California, rather than Texas (or in Delaware or New York, BMS's home states), the majority offers no persuasive answer.

34

## CONCLUSION

Like the majority, I conclude BMS, despite its significant business activities in California, is not at home in our state for purposes of asserting general personal jurisdiction over it. But neither, in my view, is specific jurisdiction over the nonresident plaintiffs' claims proper. No substantial connection has been shown between BMS's activities in California and the nonresidents' claims, which arose out of BMS's marketing and sales of Plavix in other states.

For this reason, I respectfully dissent.

**WERDEGAR, J.**


**WE CONCUR:**

**CHIN, J.**
**CORRIGAN, J.**

35

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Bristol-Myers Squibb Company v. Superior Court

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 228 Cal.App.4th 605
**Rehearing Granted**

_____

**Opinion No.** S221038
**Date Filed:** August 29, 2016

_____

**Court:** Superior
**County:** San Francisco
**Judge:** John E. Munter

_____

**Counsel:**

Lea Brilmayer; Horvitz & Levy, Jon B Eisenberg; Arnold & Porter, Jerome B. Falk, Jr., Sean M. SeLegue, Sharon D. Mayo, Jeremy McLaughlin, Steven G. Reade, Daniel S. Pariser, Anna K. Thompson, Maurice A. Letter and Anand Agneshwar for Petitioner.

Mayer Brown and Donald M. Falk for Chamber of Commerce of the United States of America, California Chamber of Commerce and Pharmaceutical Research and Manufacturers of America as Amici Curiae on behalf of Petitioner.

Goodwin Proctor, Richard A. Oetheimer, Sarah K. Frederick, David J. Zimmer and Claire C. Jacobson for Generic Pharmaceutical Association as Amicus Curiae on behalf of Petitioner.

Pepper Hamilton, Nicholas M. Kouletsis, Christopher W. Wasson and Eric S. Wolfish for American Tort Reform Association, National Association of Manufacturers, National Federation of Independent Business and Juvenile Products Manufacturers Association as Amici Curiae on behalf of Petitioner.

Utrecht & Lenvin and Paul F. Utrecht for Washington Legal Foundation as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

Napoli Bern Ripka Shkolnik, Kelly McMeekin, Hunter J. Shkolnik, John Lytle, Jessica Y. Lee, Shayna E. Sacks, Priya Gandhi; Audet & Partners, William M. Audet, Joshua C. Ezrin, Mark E. Burton; Esner, Chang & Boyer and Stuart B. Esner for Real Parties in Interest.

J. Burton LeBlanc; Andrus Anderson, Lori E. Andrus, Jenny Lee Anderson; Law Offices of Collyn A. Peddie and Collyn A. Peddie for American Association for Justice as Amicus Curiae on behalf of Real Parties in Interest.

The Arkin Law Firm, Sharon J. Arkin; Robbins Geller Rudman & Dowd and Kevin K. Green for Consumer Attorneys of California as Amicus Curiae on behalf of Real Parties in Interest.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Anand Agneshwer
Arnold & Porter
399 Park Avenue
New York, NY  10022-4690
(212) 715-1000

Stuart B. Esner
Esner, Chang & Boyer
234 East Colorado Boulevard, Suite 750
Pasadena, CA  91101
(626) 535-9860